UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
  MSV SYNERGY, LLC, MARK BARRON,      :   Case No.
                                                :
                     *Plaintiffs*,         :
                                                :   **COMPLAINT**
  v.                                          :
                                            :   **JURY TRIAL DEMANDED**
  SAADIA SHAPIRO, VADIM LEYBEL, ARI     :
  FRIEDMAN, PETER ZVEDENIUK, SHAPIRO & :
  ASSOCIATES ATTORNEYS AT LAW, PLLC,   :
  PAZ GLOBAL VENTURES, LLC, CAST CAPITAL :
  LENDING, CORP., HARLEM SUNSHINE, LLC,  :
  HARLEM RESIDENTIAL, LLC, and EAST 125TH :
  DEVELOPMENT, LLC,                       :
                                            :
                     *Defendants*.   :
---------------------------------------------------------------------x

       Plaintiffs MSV Synergy LLC and Mark Barron (collectively, "**Plaintiffs**"), by and

through their attorneys, Skiff Law Firm LLC, as and for their Complaint against defendants

Saadia Shapiro, Vadim Leybel, Ari Friedman, Peter Zvedeniuk, Shapiro & Associates Attorneys

at Law, PLLC, PAZ Global Ventures, LLC, Cast Capital Lending, Corp., Harlem Sunshine,

LLC, Harlem Residential, LLC, and East 125th Development, LLC (collectively,

"**Defendants**"), as alleges as follows:

## NATURE OF THE ACTION

       1.    This is an action sounding in, among other causes of action, breach of contract,

unjust enrichment, negligent misrepresentation, and fraud.  Defendant Saadia Shapiro used his

heightened skill, knowledge, and expertise as a licensed attorney in the state of New York to

scam a professional football athlete out of $2 million dollars ($2,000,000.00), based at least in

part, upon the false promises that he was in a unique position to deliver highly sought-after

personal protection equipment.

2.      Plaintiff Mark Barron turned over the money to Mr. Shapiro, to be held in escrow in Mr. Shapiro's law firm's attorney trust account until delivery of the equipment.  Rather than deliver the promised equipment, Mr. Shapiro induced Mr. Barron to release the money early by promising certain collateral.

3.      Mr. Shapiro never advised Mr. Barron to seek an independent review of these transactions by an attorney of his own choosing.

4.      Instead, Mr. Shapiro encouraged Mr. Barron to rely upon his multiple representations that he, a practicing attorney in the state of New York, would conduct himself honestly, professionally, and ethically.

5.      Mr. Barron relied on these representations to his detriment because Plaintiffs neither received a single shipment of the promised personal protection equipment nor the return of their $2 million dollar payment.

## THE PARTIES

6.      Plaintiff MSV Synergy, LLC ("**MSV**") is a limited liability company duly formed under the laws of the state of Delaware and authorized to do business in the state of New York, with its principal place of business located in Delaware.

7.      Plaintiff Mark Barron ("**Barron**") is an individual, residing in the state of Florida and conducts business in multiple states, including without limitation, Florida and New York. Barron, through a separate entity owned and controlled by Barron, possesses a fifty percent (50%) membership interest in MSV.

8.      Defendant Saadia Shapiro ("**Saadia**") is an individual, residing in the state of New Jersey and conducts business in multiple states, including without limitation, New Jersey and New York.  Saadia is a licensed attorney duly admitted to practice law in the state of New

York.

9.      Defendant Shapiro & Associates Attorneys at Law, PLLC ("**SAAL**") is a professional limited liability company duly formed and existing under the laws of the state of New York, with its principal place of business located in New York.  Upon information and belief, Saadia is the Managing Partner of SAAL.

10.      Defendant PAZ Global Ventures, LLC ("**PAZ**") is a limited liability company duly formed and existing under the laws of the state of New York, with its principal place of business located in New York.  Upon information and belief, Saadia is a member of PAZ.

11.      Defendant Harlem Sunshine, LLC ("**Sunshine**") is a limited liability company duly formed and existing under the laws of the state of New York, with its principal place of business located in New York.  Upon information and belief, Sunshine is wholly owned by Saadia.

12.      Defendant Harlem Residential, LLC ("**Residential**") is a limited liability company duly formed and existing under the laws of the state of New York, with its principal place of business located in New York.  Upon information and belief, Residential is wholly owned by Sunshine.

13.      Defendant East 125th Development, LLC ("**East 125**") is a limited liability company duly formed and existing under the laws of the state of Delaware, authorized to do business in New York, and with its principal place of business located in New York.  Upon information and belief, Residential possesses a twenty-five percent (25%) interest in East 125.

14.      Defendant Vadim Leybel ("**Leybel**") is an individual, residing in the state of New Jersey and conducts business in multiple states, including without limitation, New Jersey and New York.  Leybel is a business associate of Saadia.

15.     Defendant Cast Capital Lending, Corp. ("**CCL**") is corporation duly formed and existing under the laws of the state of New York, with its principal place of business located in New York.  Upon information and belief, CCL is wholly owned by Leybel.

16.     Defendant Ari Friedman ("**Friedman**") is an individual, residing in the state of New York and conducts business in multiple states, including without limitation, New York. Friedman is a business associate of Saadia.

17.     Defendant Peter Zvedeniuk ("**Zvedeniuk**") is an individual, residing in Melbourne, Victoria, Australia and conducts business in multiple states, including without limitation, New York.  Zvedeniuk is a business associate of Saadia.

18.     MSV is a distributor primarily in the business of importing and selling personal protection equipment ("**PPE**"), (the "**Business**").

19.     Barron is a professional football athlete in the National Football League and as such, is the primary financier of MSV's business dealings through his wholly owned entity BC, while MSV's other two individual members, non-parties Victoria Boyle-Hebron ("**Boyle-Hebron**") and Sandy H. Sandiford ("**Sandiford**"), bring with them over fifteen (15) years of experience in the import/export business.

20.     Upon information and belief, Saadia, an attorney duly licensed to practice law in the state of New York, operates a side hustle comprised of developing, manufacturing, and exporting PPE.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

22.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims

occurred in this district and the parties contractually agreed to lay venue in this district.

23.     All conditions precedent to the institution of this action have been performed, have occurred, or have otherwise been waived.

24.     Damages, including liquidated damages and attorneys' fees, are likely to exceed $150,000.00.

## STATEMENT OF FACTS

### A.  Plaintiffs' Business

25.     The PPE industry is highly competitive, and for this reason, Plaintiffs have expended substantial time, money, and effort on the development of business techniques and strategies designed to help build lasting relationships with clients and vendors and enable MSV to maintain its competitive edge and positive reputation in the industry.

26.     To further promote its brand, MSV has cultivated a foundation of trust and loyalty among its members, employees, clients, affiliates, and business partners.

27.     The first pillar of MSV's Business is to provide timely delivery of PPE to its clients and this, of course, leaves MSV heavily reliant on reputable suppliers who also make timely deliveries of product.

28.     Second only to timeliness, MSV demands high-quality products from its suppliers to further cement the foundation of trust, loyalty, and goodwill it enjoys with its clients.

29.     Indeed, by consistently providing timely high-quality PPE supplies, as well as Plaintiffs' respective reputations, their course of conduct and the professional manner with which they interact with clients and affiliates, and their historical presence in the PPE industry, Plaintiffs' clients are more likely to seek their PPE supply from MSV, as opposed to one of MSV's competitors.

30.     In short, the need for PPE, and in particular gloves, as a result of the novel COVID-19 pandemic, is the source of demand that MSV seeks to fulfill through its cultivated supply chains.

31.     It is no secret that demand for PPE spiked exponentially because of the pandemic and thus, Plaintiffs' firm footing in the industry prior to the pandemic made MSV an attractive choice for PPE supply.

**B.   The Parties' Transactions and Defendants' Failure to Perform**

32.     In September 2020, Friedman introduced Plaintiffs to his business associate, Saadia.  During this introduction, Saadia represented that he could obtain from his contacts in Guangdong, China, five hundred ten thousand (510,000) powder-free, nitrile, medical examination gloves with a glove thickness of at least four (4) mil. (the "**Medical Gloves**") and approved by the United States Food and Drug Administration ("**FDA**").

33.     Following certain verbal negotiations, on or about October 30, 2020, MSV entered a written agreement with and prepared by PAZ, entitled "Sales and Purchase Agreement" (the "**SPA**"), whereby MSV agreed to buy and PAZ agreed to sell two hundred fifty thousand (250,000) boxes, containing one hundred (100) Medical Gloves per individual box.  A true and correct copy of the SPA is annexed hereto as **Exhibit A**.

34.     The SPA further required that MSV wire the sum of $2 million dollars ($2,000,000.00) to the attorney trust account of SAAL (Saadia's law firm), to act as "escrow agent and paymaster".

35.     In furtherance of the SPA, SAAL and MSV entered an agreement entitled "Escrow & Paymaster Agreement", which among other things, required SAAL to hold the funds in escrow, pending PAZ's performance under the SPA and MSV's approval of same (the

"**Escrow Agreement**").  A true and correct copy of the Escrow Agreement is annexed hereto as **Exhibit B**.

36.     Pursuant to the terms of the Escrow Agreement, SAAL was precluded from releasing the funds until they received written consent and approval from Barron.

37.     Despite Saadia's legal background, status as a licensed attorney in New York and his superior knowledge, expertise and understanding of the implications and consequences of Plaintiffs' execution of the SPA and Escrow Agreement, Saadia failed to advise Plaintiffs of their right to have the Assignment and Guarantee independently reviewed by counsel of their choosing.

38.     Plaintiffs reasonably relied on Saadia's representations that he, as a practicing attorney would perform PAZ's obligations under the SPA and SAAL's obligations under the Escrow Agreement in an honest, professional, and ethical manner.

39.     Further relying upon Saadia's representations as to his character, Plaintiffs did not seek an independent review of the SPA or Escrow Agreement prior to its execution.

40.     Pursuant to the terms of the SPA, PAZ was required to finance the export/import operations necessary to fully perform its obligations under the SPA.

41.     Put another way, the $2 million dollars ($2,000,000.00) being held in escrow in SAAL's attorney trust account (the "**Escrowed Monies**") were to remain in escrow until the goods were imported and delivered to a site located within 25 miles of the Metropolitan New York / New Jersey area, inspected, and approved by MSV.

42.     Following said approval by MSV, Barron would cause to be released to PAZ, the Escrowed Monies.

43.     Saadia represented to Plaintiffs that MSV would start receiving shipments in as

few as three to four weeks following full execution of the SPA and Escrow Agreement and payment of the Escrowed Monies but under no circumstances, later than forty-five (45) days thereof.

44.     Accordingly, Plaintiffs were to begin receiving shipments in or around late November and/or early December 2020.

45.     In or around October 2020, Saadia represented to Plaintiffs that shipments were "on the water" and "ahead of schedule."

46.     Contrary to his prior representations to Plaintiff, however, in or around November 2020, Saadia represented to Plaintiffs that PAZ could no longer perform its obligations under the SPA – namely, it was no longer able to deliver to MSV the Medical Gloves due to pending litigation with his supply.

47.     Rather than return the Escrowed Monies, however, by email dated December 7, 2020, Saadia represented that PAZ could import the Medical Gloves from a manufacturing plant in Thailand (as opposed to Guangdong, China).

48.     Saadia represented to Plaintiffs that he was opening a new office in Thailand and his business associate, Zvedeniuk, who was stationed at the manufacturing plant in Thailand, could assist to inspect and ensure the quality and timing of the shipments of Medical Gloves from this new location.

49.     In sum and substance, Saadia represented:  (i) that the first four shipments of gloves exported from China would contain non-FDA approved one hundred percent (100%) Nitrile gloves (the "**Nitrile Gloves**") (Saadia and PAZ declined to provide a discount for this product despite the fact that it was inferior to the contracted for Medical Gloves); and (ii) that the last four shipments of gloves imported from Thailand would be the Medical Gloves agreed upon

in the SPA.

50.     In or around late November and/or early December 2020, Saadia represented to Plaintiffs that he was having difficulties procuring funds for the first four shipping containers of Nitrile Gloves, despite PAZ's obligation under the SPA to finance the shipments.

51.     On December 7, 2020, Saadia demanded that Plaintiffs release the Escrowed Monies to pay for the first four shipping containers of Nitrile Gloves from China and the last four shipping containers of Medical Gloves from Thailand.

52.     By email dated December 7, 2020, Saadia represented to Plaintiffs that if Barron would agree to release to PAZ the Escrowed Monies, MSV could receive as many shipments of Nitrile Gloves as it wanted within 13 to 17 days of said release.  A true and correct copy of the December 7 email is annexed hereto as **Exhibit C**.

53.     Barron was not comfortable releasing the Escrowed Monies prior to receipt of the contracted for PPE.  Accordingly, Plaintiffs represented to Saadia that they would only agree to release the Escrowed Monies upon a pledge of sufficient collateral to cover the amount of the Escrowed Monies.

54.     In response to Plaintiffs' demand for collateral, on or about December 7, 2020, Saadia created a conditional assignment of his membership interest in Sunshine for the benefit of Barron (the "**Assignment**").  A true and correct copy of the Assignment is annexed hereto as **Exhibit D**.

55.     The Assignment was meant to serve as collateral for the release of the Escrowed Monies – namely, by conditionally transferring to Barron, Saadia's purported assignable interest in four parcels of real property located at 69 E. 125th Street, New York, New York, 71 East 125th Street, New York, New York, 75 East 125th Street, New York, New York, and 56 East

126th Street, New York, New York (the "**Real Property**").

56.    To convince Barron that the Assignment was valid and enforceable, Saadia represented to Plaintiffs the following:  (a) Saadia was and is the sole member of Sunshine; (b) Sunshine was and is the sole member of Residential; (c) Residential possesses a twenty-five percent (25%) interest in East 125; and (d) East 125 owns the Real Property.

57.    To backup said representations, Saadia provided Plaintiffs with a copy of Sunshine's operating agreement dated February 8, 2016 (the "**Sunshine OA**"), which purports to show that Sunshine is wholly owned by Saadia.  A true and correct copy of the Sunshine OA is annexed hereto as **Exhibit E**.

58.    Despite due demand therefor, however, Saadia failed and refused to produce Residential's operating agreement (the "**Residential OA**"), a copy of title, certificate, lien, deed, or any other document that would support his representation to Plaintiffs that Sunshine is the sole member of Residential.

59.    Saadia did, however, produce to Plaintiffs a copy of East 125's operating agreement dated October 24, 2014 (the "**East 125 OA**"), purporting to evidence Residential's twenty-five percent (25%) ownership interest in East 125 and East 125's ownership of the Real Property.  A true and correct copy of the East 125 OA produced by Saadia is annexed hereto as **Exhibit F**.

60.    Notwithstanding Saadia's refusal to produce the Residential OA, the recitals in the Assignment state in pertinent part that by virtue of Saadia's one hundred percent (100%) membership interest in Sunshine, Sunshine's one hundred percent (100%) membership interest in Residential, Residential's twenty-five percent (25%) membership interest in East 125, and East 125's ownership interest in the Real Property, Saadia indeed possesses a sufficient

assignable interest in the Real Property to pledge as collateral for and to cover the amount of the Escrowed Monies.

61.     In furtherance of Saadia's representations that he possessed an assignable interest in the Real Property, Saadia produced to Plaintiffs a document entitled, "Confidential Offering Memorandum", purporting to further evidence Saadia's assignable interest in the Real Property (the "**COM**").

62.     Noteworthy, while the Assignment represents that East 125 owns **_56_** East 126th Street New York, New York, the East 125 OA states in pertinent part that its ownership interest is in **_58_** East 126th Street, New York, New York.  To date, Saadia has failed and refused to clarify which of these properties East 125 actually owns.

63.     As further inducement and to convince Barron to release the Escrowed Monies to Saadia, Saadia also presented Barron with a document entitled, "Guarantee Agreement" (the "**Guarantee**"), which, among other things, guaranteed repayment of the Escrowed Monies to Barron if, after the expiration of a 30-day period, PAZ was unable to perform its obligations under the SPA to deliver the promised PPE.  A true and correct copy of the Guarantee is annexed hereto as **Exhibit G**.

64.     Despite Saadia's legal background as a licensed attorney in New York and his superior knowledge, expertise and understanding of the implications and consequences of Barron's execution of the Assignment and Guarantee, Saadia failed to advise Barron of his right to have the Assignment and Guarantee independently reviewed by counsel of his choosing and/or to perform independent due diligence.

65.     Instead, upon information and belief, Saadia presented Barron with the Assignment and Guarantee and demanded that he execute them that same day.

66.     Plaintiffs reasonably relied on Saadia's representations that he, as a practicing attorney would perform his obligations under the Assignment and Guarantee in an honest, professional, and ethical manner, and in the spirit in which he presented them to Barron.

67.     Following the parties' execution of the Assignment and Guarantee, Barron promptly fulfilled his obligations thereunder, causing to be released to Saadia the Escrowed Monies for the sole purpose of purchasing the contracted for PPE.

68.     By its own terms, Barron does not lose his rights, title and interest in Saadia's Sunshine's, Residential's, and East 125's respective membership interests in one another, and East 125's respective ownership interest in the Real Property, until after MSV has received, inspected and approved in writing the contracted for PPE, as provided in the SPA.

69.     Despite MSV's full performance under the terms of the SPA, Assignment and Guarantee, PAZ has failed to deliver to MSV a single shipment of PPE, as was promised under the terms thereof.

70.     Further, it has been more than 30 days since shipments were promised by Saadia to have been delivered to Plaintiffs and still, MSV has not received the promised PPE.

71.     Notwithstanding Saadia's obligations under the Assignment and Guarantee and despite due demand therefor, Saadia has failed and refused to return the Escrowed Monies to Plaintiffs, as is required under the Assignment and Guarantee.

72.     Incidentally, in or around December 2020, Saadia offered gloves to Plaintiffs because another client of Saadia had declined to accept receipt of them.  Relying on Saadia's representations that the gloves were of the quality demanded in the SPA, Plaintiffs offered the gloves to one of MSV's business associates.

73.     Upon receiving shipment of gloves, however, MSV's business associate promptly

advised Plaintiffs that the gloves were of extremely poor quality and could not be accepted.

74.     Saadia repeatedly represented to Plaintiffs that they would receive shipments of the Nitrile Gloves in or around January 2021.  Predicated on Saadia's representations, Plaintiffs advised MSV's clients that they would be receiving shipments of the Nitrile Gloves in or around January 2021.

75.     Despite Saadia's repeated representations, however, January 2021 came and went and Saadia still had failed and refused to deliver a single shipment of Nitrile Gloves.

76.     On or about January 7, 2021, to convince Plaintiffs that the shipments of Nitrile Gloves were in transit, Saadia sent a document purporting to be a copy of a "Bill of Lading" marked "(DRAFT)" (the "**Bill of Lading**").  A true and correct copy of the draft Bill of Lading is annexed hereto as **Exhibit H**.

77.     By email dated January 7, 2021, Saadia advised Plaintiffs that he would send them the original Bill of Lading the following day.  A true and correct copy of Saadia's January 7 email is annexed hereto as **Exhibit I**.

78.     To date, Saadia has never produced the original Bill of Lading and Plaintiffs never received a single shipment of Nitrile Gloves.

79.     By email dated January 12, 2021, Saadia sent Plaintiffs a purported "update" as to the status of their shipments and detailed two shipments that were purportedly already booked to ensure their arrival on or before February 8, 2021.  A true and correct copy of Saadia's January 12 email is annexed hereto as **Exhibit J**.

80.     Notwithstanding Saadia's representation that two shipments were to be delivered on or before February 8, 2021, to date, Plaintiffs have never received a single shipment of PPE.

81.     On or about February 2, 2021, Saadia, his business associate Zvedeniuk, and non-

parties Boyle-Hebron and Sandiford discussed via telephone conference the status of the promised shipments.  During the call, Saadia and Zvedeniuk acknowledged that the shipments had been "delayed" but again, reassured Plaintiffs that said shipments of PPE would indeed be delivered.

82.     Notwithstanding Saadia's and Zvedeniuk's reassurances, to date, Plaintiffs have never received a single shipment of PPE.

83.     As of March 11, 2021, Plaintiffs had still not received a single shipment of PPE. Accordingly, Plaintiffs had another call with Saadia and one of Saadia's business associates, Leybel.  Saadia and Leybel failed and refused to provide Plaintiffs with any certainty with respect to the status of the contracted for shipments of PPE or when Plaintiffs could expect to receive the first shipment.

84.     Following the March 11 call with Saadia and Leybel, Saadia advised Plaintiffs that four Nitrile Glove shipments were in transit and would be delivered to a facility in the state of California.

85.     Notwithstanding that the SPA required delivery within 25 miles of the Metropolitan New York / New Jersey area, Sandiford and a one of MSV's clients flew to California to inspect the shipment of Nitrile Gloves.

86.     Immediately upon inspection, Sandiford and MSV's client observed the Nitrile Gloves to be counterfeits made of extremely poor quality and with only 40 gloves per box whereas the SPA required the delivery of boxes containing 100 gloves per box.

87.     Contemporaneously and before Plaintiffs had the chance to warn one of its other clients of the poor quality of the gloves, Plaintiffs' other client independently inspected the purported Nitrile Gloves.  This client immediately advised Plaintiffs that the Nitrile Gloves were

counterfeit and as a result, it terminated its business relationship with Plaintiffs.

88.     To date, this second client has not resumed conducting business with Plaintiffs.

89.     As a result of the observed non-conforming poor quality of the shipped gloves, Plaintiffs rejected same.

90.     Accordingly, Saadia retained possession of the gloves.  However, he had the audacity to charge Plaintiffs the sum of $38,000 to do so.

91.     Pursuant to a shipping schedule obtained by Plaintiffs via Import Genius®, multiple shipments of PPE have been delivered to Saadia and/or for benefit of Saadia and various of the other Defendants (the "**Shipping Schedule**").  A true and correct copy of the Shipping Schedule is annexed hereto as **Exhibit K**.

92.     Notwithstanding Saadia's receipt of multiple shipments of PPE, which upon information and belief, were procured through the use of the Escrowed Monies, Saadia never allocated a single shipment to and/or for the benefit of MSV in accordance with the SPA.

93.     To date, and despite due demand therefor, Saadia has failed and refused to produce an accounting, demonstrating, among other things, where the Escrowed Monies were paid and for what purpose.

94.     In response to these requests, rather, Saadia forwarded to Plaintiffs a photograph depicting a hand-written Post-It® note, purporting to demonstrate how the Escrowed Monies were spent and for what purpose (the "**Post-It® Note**").  A true and correct copy of the Post-It® Note is attached hereto as **Exhibit L**.

95.     A review of the Post-It® Note fails to provide any meaningful or verifiable information whatsoever and, in any event, falls woefully short of generally accepted accounting principles (GAAP) or the professional and detailed accounting one would expect from an

attorney handling millions of dollars through his firm's trust account. Among other things, the Post-It® Note fails to show (a) where the Escrowed Monies were distributed, (b) when they were distributed and (c) for what purpose.

96.     Upon information and belief, Saadia and Leybel used the Escrowed Monies to front the purchase of PPE and then sell said PPE to third-parties for a profit, depriving Plaintiffs of the benefit of their bargain and the Escrowed Monies; and to enrich themselves and their respective business concerns. A true and correct copy of an email dated August 5, 2021 received by Barron from an anonymous source detailing and corroborating the veracity of the aforementioned scheme is annexed hereto as **Exhibit M**.

97.     By letter dated May 19, 2021, pursuant to the SPA, Escrow Agreement, Assignment and Guarantee, Plaintiffs demanded from Defendants the return of the Escrowed Monies. To date, Defendants have failed and refused to return to Plaintiffs the Escrowed Monies.

98.     Defendants have benefited from and will continue to benefit from their unfettered use of the Escrowed Monies to the detriment of Plaintiffs and their refusal to deliver to MSV a single shipment of PPE.

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
(*Breach of Contract as to the SPA as against PAZ*)

99.     Plaintiffs repeat and reallege Paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.    The SPA is a valid and enforceable contract between MSV and PAZ.

101.    In addition to the aforementioned conduct of all Defendants, PAZ materially breached the SPA by, among other things:  (a) failing and refusing to within 45 days of the execution of the SPA deliver to MSV shipments of Medical Gloves within 25 miles of the

Metropolitan New York / New Jersey area; and (b) failing and refusing to return to Plaintiffs the Escrowed Monies.

102.    PAZ's breach has had the effect of depriving Plaintiffs of the benefit of their bargain under the terms of the SPA.

103.    As a result of PAZ's breach, Plaintiffs have suffered damages, including, without limitation, incidental, consequential, reputational and money damages, in an amount to be determined at trial but in any event, not less than $2,000,000.

104.    In addition, Plaintiffs have and will continue to incur attorneys' fees and costs as a result of PAZ's breach of the SPA.

## AS AND FOR A SECOND CAUSE OF ACTION
(*Breach of Contract as to the Escrow Agreement as against Saadia and SAAL*)

105.    Plaintiffs repeat and reallege Paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    The Escrow Agreement is a valid and enforceable contract between Barron, on the one hand, and Saadia and SAAL, on the other hand.

107.    In addition to the aforementioned conduct of all Defendants, Saadia and SAAL materially breached the Escrow Agreement by, among other things:  (a) releasing to PAZ and Saadia the Escrowed Monies under false pretenses; and (b) failing and refusing to return to Plaintiffs the Escrowed Monies.

108.    Saadia's and SAAL's respective breaches have had the effect of depriving Plaintiffs of the benefit of their bargain under the terms of the SPA and Escrow Agreement.

109.    As a result of Saadia's and SAAL's breach, Plaintiffs have suffered damages, including, without limitation, incidental, consequential, reputational and money damages, in an amount to be determined at trial but in any event, not less than $2,000,000.

110.    In addition, Plaintiffs have and will continue to incur attorneys' fees and costs as a result of Saadia's and SAAL's breaches of the Escrow Agreement.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Breach of Contract as to the Assignment as against Saadia)*

111.    Plaintiffs repeat and reallege Paragraphs 1 through 110 of this Complaint as if fully set forth herein.

112.    The Assignment is a valid and enforceable contract between Barron, on the one hand, and Saadia, on the other hand.

113.    In addition to the aforementioned conduct of all Defendants, Saadia materially breached the Assignment by, among other things:  (a) failing and refusing to provide Plaintiffs documentation supporting the factual assertions therein – namely, that Saadia possessed an assignable interest in the Real Property; (b) failing and refusing to instruct or advise Plaintiffs on the manner in which they could access the collateral in furtherance of the Assignment; and (c) failing and refusing to assign to Plaintiffs his assignable interest defined in the Assignment after PAZ failed and refused to perform its obligations under the terms of the SPA.

114.    Saadia's breach has had the effect of depriving Plaintiffs of the benefit of their bargain under the terms of the Assignment – *i.e.*, the collateral.

115.    As a result of Saadia's breach, Plaintiffs have suffered damages, including, without limitation, incidental, consequential, reputational and money damages, in an amount to be determined at trial but in any event, not less than $2,000,000.

116.    In addition, Plaintiffs have and will continue to incur attorneys' fees and costs as a result of Saadia's breach of the Assignment.

### AS AND FOR A FOURTH CAUSE OF ACTION
(*Breach of Contract as to the Guarantee as against Saadia*)

117.    Plaintiffs repeats and realleges Paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118.    The Guarantee is a valid and enforceable contract between Barron, on the one hand, and Saadia, on the other hand.

119.    In addition to the aforementioned conduct of all Defendants, Saadia materially breached the Assignment by, among other things, failing to return to Plaintiffs the Escrowed Monies within 30 days of PAZ's failure to perform its obligations under the terms of the SPA.

120.    Saadia's breach has had the effect of depriving Plaintiffs of the benefit of their bargain under the terms of the Assignment – *i.e.*, the return of the Escrowed Monies after PAZ failed and refused to perform under the terms of the SPA.

121.    As a result of Saadia's breach, Plaintiffs have suffered damages, including, without limitation, incidental, consequential, reputational and money damages, in an amount to be determined at trial but in any event, not less than $2,000,000.

122.    In addition, Plaintiffs have and will continue to incur attorneys' fees and costs as a result of Saadia's breach of the Assignment.

### AS AND FOR A FIFTH CAUSE OF ACTION
(*Unjust Enrichment as against
Saadia, Leybel, Zvedeniuk, PAZ and CCL*)

123.    Plaintiffs repeat and reallege Paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    Based on upon the aforementioned conduct, Saadia, Leybel, Zvedeniuk, PAZ and CCL substantially benefited from Plaintiffs' Escrowed Monies to the detriment of Plaintiffs.

125.    Equity and good conscious do not permit Defendants to retain such benefit without payment to Plaintiffs.

**AS AND FOR A SIXTH CAUSE OF ACTION**
(*Negligent Misrepresentation as against Friedman, Saadia, Leybel, Zvedeniuk, PAZ and SAAL*)

126.    Plaintiffs repeat and reallege Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.    There exists a special relationship between Barron and Friedman.

128.    There exists a special relationship between Barron and Saadia.

129.    There exists a special relationship between Barron and Leybel.

130.    There exists a special relationship between Barron and Zvedeniuk.

131.    As a result of these special relationships, Friedman, Saadia, Leybel and Zvedeniuk, each independent of one another and collectively owed to Barron the utmost duty of loyalty and care with respect to the numerous representations they made to Barron as set forth in more detail above.

132.    As set forth in detail above, Friedman, Saadia, Leybel and Zvedeniuk each knowingly and willfully made material false representations to Plaintiffs that they knew or should have known were untrue at the time they made such representations.

133.    These representations were known by Friedman, Saadia, Leybel and Zvedeniuk to be desired by Plaintiffs to consider, among other things, the implications and consequences of making payment of the Escrowed Monies in furtherance of the SPA and Escrow Agreement and later causing to be released to PAZ the Escrowed Monies in furtherance of the Assignment and Guarantee.

134.    Friedman, Saadia, Leybel and Zvedeniuk knew or should have known that Plaintiffs intended to rely on these representations in determining whether to enter the SPA,

Escrow Agreement, Assignment and Guarantee, and to perform Plaintiffs' obligations thereunder.

135.    Plaintiffs did, in fact, rely upon these representations to their detriment.

136.    As a result of the aforementioned negligent misrepresentations of Friedman, Saadia, Leybel and Zvedeniuk, Plaintiffs have suffered substantial damages in an amount to be determined at trial but in any event not less than $2,000,000.

137.    In addition, Plaintiffs have and will continue to incur attorneys' fees and costs as a result of Saadia's breach of the Assignment.

## AS AND FOR A SEVENTH CAUSE OF ACTION
*(Fraud as against Friedman, Saadia, Leybel, Zvedeniuk, PAZ and SAAL)*

138.    Plaintiffs repeat and reallege Paragraphs 1 through 137 of this Complaint as if fully set forth herein.

139.    As set forth in detail above, Friedman, Saadia, Leybel and Zvedeniuk each knowingly and willfully made to Plaintiffs material misrepresentations of fact.

140.    Friedman, Saadia, Leybel and Zvedeniuk each had knowledge of the falsity of said material misrepresentations and intended that Plaintiffs rely on said misrepresentations to their detriment.

141.    Plaintiffs did, in fact, reasonably and justifiably rely upon these misrepresentations to their detriment by, among other things:  (a) entering the SPA, Escrow Agreement, Assignment and Guarantee; (b) performing their obligations thereunder; and (c) causing to be released to PAZ the Escrowed Monies.

142.    As a result of the aforementioned fraud of Friedman, Saadia, Leybel and Zvedeniuk, Plaintiffs have suffered substantial damages in an amount to be determined at trial but in any event not less than $2,000,000.

21

143.    As a result of the aforementioned fraud of Friedman, Saadia, Leybel and Zvedeniuk, Plaintiffs are entitled to an award of punitive damages, attorneys' fees and costs.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
(*Fraudulent Inducement as against Friedman, Saadia, Leybel, Zvedeniuk, PAZ and SAAL*)

144.    Plaintiffs repeat and reallege Paragraphs 1 through 143 of this Complaint as if fully set forth herein.

145.    As set forth in detail above, Friedman, Saadia, Leybel and Zvedeniuk each knowingly and willfully made to Plaintiffs misrepresentations and/or omissions of material fact.

146.    Friedman, Saadia, Leybel and Zvedeniuk each had knowledge of the falsity of said material misrepresentations and/or omissions and intended that said misrepresentations induce Plaintiffs' reliance thereon.

147.    Plaintiffs did, in fact, reasonably and justifiably rely upon these inducements by, among other things:  (a) entering the SPA, Escrow Agreement, Assignment and Guarantee; (b) performing their obligations thereunder; and (c) causing to be released to PAZ the Escrowed Monies.

148.    As a result of the aforementioned fraudulent inducement of Friedman, Saadia, Leybel and Zvedeniuk, Plaintiffs have suffered substantial damages in an amount to be determined at trial but in any event not less than $2,000,000.

149.    As a result of the aforementioned fraudulent inducement of Friedman, Saadia, Leybel and Zvedeniuk, Plaintiffs are entitled to an award of punitive damages, attorneys' fees and costs.

## AS AND FOR A NINTH CAUSE OF ACTION

(*Breach of Implied Covenant of Good Faith and Fair Dealing
as against PAZ, Saadia and SAAL*)

150.    Plaintiffs repeat and reallege Paragraphs 1 through 149 of this Complaint as if fully set forth herein.

151.    The SPA, Escrow Agreement, Assignment and Guarantee constitute valid and binding agreements (the "**Agreements**").

152.    Implicit in each of the Agreements are covenants of good faith and fair dealing, which encompasses any promise that a reasonable promisee would understand to be included.

153.    Plaintiffs reasonably expected PAZ's, Saadia's, and SAAL's performance in the respective agreements to result in either delivery of the promised PPE or the return of the Escrowed Monies.

154.    PAZ, Saadia and SAAL breached the implied covenant of good faith and fair dealing by, among other things as set more fully above, seeking to prevent their respective performance under the Agreements and/or to withhold from Plaintiffs the Agreements' benefits.

155.    As a result of PAZ's, Saadia's and SAAL's breaches of the respective Agreements, Plaintiffs have suffered damages, including, without limitation, incidental, consequential, reputational and money damages, in an amount to be determined at trial but in any event, not less than $2,000,000.

156.    In addition, Plaintiffs have and will continue to incur attorneys' fees and costs as a result of Saadia's breach of the Assignment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs MSV Synergy LLC and Mark Barron demand judgment against defendants Saadia Shapiro, Vadim Leybel, Ari Friedman, Peter Zvedeniuk, Shapiro & Associates Attorneys at Law, PLLC, PAZ Global Ventures, LLC, Cast Capital Lending, Corp., Harlem Sunshine, LLC, Harlem Residential, LLC, and East 125th Development, LLC, as follows:

A.      As to the First Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

B.      As to the Second Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

C.      As to the Third Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

D.      As to the Fourth Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

E.      As to the Fifth Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

F.      As to the Sixth Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

G.      As to the Seventh Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

H.      As to the Eighth Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

I.      As to the Ninth Cause of Action, an award of damages in an amount to be determined at trial but not less than $2,000,000.00;

J.      Together with pre- and post-judgment interest, reasonable attorneys' fees, costs and such other and further relief as the Court deems just and proper.

Dated:  Whippany, New Jersey
         September 10, 2021

                                          Respectfully submitted,

                                          SKIFF LAW FIRM LLC


                              By:  _____*s/ Gregory J. Skiff*_____
                                          Gregory J. Skiff
                                          28 Marlin Drive
                                          Whippany, New Jersey 07981
                                          (T) 201.787.8701
                                          GJS@skifflaw.com

                                          *Attorneys for Plaintiffs*
                                          *MSV Synergy LLC and Mark Barron*