UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MSV SYNERGY, LLC and MARK BARRON,

                Plaintiffs,

          v.

SAADIA SHAPIRO, SHAPIRO & ASSOCIATES
ATTORNEYS AT LAW, PLLC, PAZ GLOBAL
VENTURES, LLC, HARLEM SUNSHINE, LLC,
HARLEM RESIDENTIAL, LLC, EAST 125TH
DEVELOPMENT, LLC, VADIM LEYBEL, CAST
CAPITAL LENDING, CORP., PETER
ZVEDENIUK, ARI FRIEDMAN, and BORIS
LEYBEL,

                Defendants.

**OPINION AND ORDER**

21 Civ. 7578 (ER)

---

Ramos, D.J.:

      MSV Synergy LLC ("MSV") and Mark Barron brought this action on September 10,

2021 raising various common law claims regarding an alleged fraudulent scheme whereby

Defendants induced Plaintiffs to pay them $2 million in exchange for personal protective

equipment ("PPE") that was never received.  Doc. 1.  Before the Court is the motion brought by

defendants Shapiro,[1] Shapiro & Associates, and PAZ to compel arbitration or, in the alternative,

to dismiss the first amended complaint ("FAC") for lack of subject matter jurisdiction and failure

to state a claim, Doc. 51; East 125th's motion to dismiss for failure to state a claim, Doc. 48; and

Vadim Leybel ("Vadim") and Cast's motion to dismiss for failure to state a claim, Doc. 56.  For

the reasons set forth below, the motions are GRANTED.

---

[1] While Shapiro, Shapiro & Associates, and PAZ submit a joint motion, Shapiro appears *pro se*.  Doc. 51 at 1.

I.     **BACKGROUND**[2]

   *A. Parties*

   Barron is a professional football player.  ¶¶ 7, 20.  MSV is a limited liability company ("LLC") with a principal place of business in Delaware that imports and sells PPE.  ¶¶ 6, 19. Barron possesses a 50% membership interest in MSV and serves as the primary financier of the company.  ¶¶ 7, 20.  MSV's two other members are non-parties Victoria Boyle-Hebron and Sandy Sandiford.  ¶ 20.

   In September 2020, defendant Ari Friedman introduced Barron to his business associate Saadia Shapiro.  ¶¶ 17, 60.  Shapiro, a licensed attorney in New York, is a managing partner at Shapiro & Associates.  ¶¶ 8–9.  Shapiro & Associates is a law firm with its principal place of business in New York.  ¶ 9.  Shapiro also operates a side business of manufacturing and exporting PPE.  ¶ 21.  PAZ is an LLC with its principal place of business in New York.  ¶ 10. Shapiro is also a member of PAZ.  *Id.*

   Defendant Harlem Sunshine, wholly owned by Shapiro, is an LLC with its principal place of business in New York.  ¶ 11.  Harlem Sunshine in turn owns Harlem Residential, an LLC with its principal place of business in New York.  ¶ 12.  East 125th is an LLC with its principal place of business in New York.  ¶ 13.  Harlem Residential owns a 25% interest in East 125th.  *Id.*  Plaintiffs allege that at all relevant times, Shapiro purported to have actual authority to act on behalf of Harlem Sunshine, Harlem Residential, and East 125th.  ¶ 90.

   Vadim is a business associate of Shapiro.  ¶ 14.  Boris Leybel ("Boris") is Vadim's father and also an associate of Shapiro.  ¶ 15.  Cast is a corporation with its principal place of business

---

[2] Unless otherwise noted, citations to "¶ _" refer to the FAC, Doc. 44.

in New York owned by Vadim "and/or" Boris.  ¶ 16.  Zvedeniuk is also a business associate of

Shapiro.  ¶ 18.

### B.  Factual Background

After Friedman introduced Barron and Shapiro in September 2020, Shapiro told Barron

that he could obtain 510,000 FDA-approved medical gloves from his business associates in

Guangdong, China.  ¶ 60.  On October 30, 2020, MSV signed a Sale and Purchase Agreement

(the "SPA") drafted by PAZ wherein MSV agreed to buy 250,000 boxes, each containing 100

medical gloves, from PAZ.  ¶ 61; Doc. 44-1.  PAZ was required to finance the export and import

operations.  ¶ 68.  The SPA stated that "[t]he Seller and Buyer hereby record that they are not

subject to any pending or threatened litigation . . . that could interfere with its performance of

this SPA."  Doc. 44-1 at 7.  It also included an arbitration clause, stipulating that any dispute

between the parties would "be resolved by arbitration according to the rules of the American

Arbitration Association."  *Id.*[3]  The SPA also stated that it "contains the entire agreement of the

Parties . . . and supersedes all prior written and oral agreements, and all contemporaneous oral

agreements, relating to such transactions."  *Id.* at 9.  The SPA also required PAZ and MSV to

---

[3] In its entirety, Section 15 of the SPA, entitled "Governing Law, Jurisdiction and Disputes" reads:

> i. <u>Governing Law.</u>  The laws of the State of New York shall govern this agreement.

> ii. Should any dispute arise between the parties, that dispute shall be resolved by arbitration according to
> the rules of the American Arbitration Association.  A party may not submit to arbitration without providing
> the other party with 10 days' notice of the dispute, and 20 additional days to remedy the claim.

> [iii.] The Parties will share the cost of such arbitration;  however should the arbitrator determine the
> liability of a party or should the claimed disputes be found to be frivolous, the harmed party shall receive
> from the party causing such harm a refund of any payments made for the cost of the arbitration.

> [iv.] Judgment on the award rendered by the arbitrator(s) may be entered by any court having jurisdiction
> over the dispute.  In the event that the parties cannot agree upon an arbitrator within a 60-day period, each
> party shall designate an arbitrator and those two arbitrators shall choose a third arbitrator.

Doc. 44-1 at 8.

enter into a separate "Escrow & Paymaster Agreement" which required Shapiro & Associates to hold the purchase funds in escrow until the goods were delivered to a site within 25 miles of the New York/New Jersey Metropolitan area, inspected, and released with Barron's written consent. ¶¶ 63–64, 69–70; Doc. 44-2.  While the escrow agreement required that "all actions or proceedings arising in connection with [it] be tried and litigated exclusively in the federal courts located in New York," it also stated that it was "not intended to amend or supersede any provision of the [SPA]."  Doc. 44-2 at 8, 10.

In accordance with the SPA and escrow agreement, MSV wired $2,000,000 to Shapiro & Associates' attorney trust account to be held in escrow.  ¶ 62.  Shapiro told Plaintiffs that shipments would be received in as few as three or four weeks, but no later than 45 days, after execution of the SPA and escrow agreement.  ¶ 71.  In October 2020, Shapiro told Plaintiffs that the shipments from Guangdong, China were "on the water" and "ahead of schedule."  ¶¶ 73, 75. However, in November 2020, Shapiro informed Plaintiffs that the gloves would not be delivered due to ongoing litigation related to his supply of PPE.  ¶ 74.  On December 7, 2020 Shapiro stated in an email to MSV that PAZ could instead import four shipments of non-FDA approved gloves from China as well as four shipments of FDA-approved gloves from Thailand.  ¶¶ 75, 77. He represented that he was opening a new office in Thailand and his business associate, Zvedeniuk, was stationed at the manufacturing plant and could inspect the gloves.  ¶ 76.

However, Shapiro then stated that he was having difficulty procuring funds for the shipments from China.  ¶ 78.  Shapiro then demanded that Plaintiffs release the escrowed funds to pay for the eight shipments, and stated that if the funds were released, MSV could receive as many shipments of gloves as it wanted within 13 to 17 days.  ¶¶ 79–80.  Plaintiffs declined to do so unless Shapiro pledged collateral to cover the amount.  ¶ 81.  Shapiro thus drafted a

conditional assignment of his membership interest in Harlem Sunshine for the benefit of Barron.
¶ 82.  Shapiro informed Barron that he was the sole member of Harlem Sunshine, that Harlem
Sunshine was the sole member of Harlem Residential, and that Harlem Residential possessed a
25% interest in East 125[th].  ¶ 84.  Shapiro further represented that East 125[th] owned four parcels
of real property in Manhattan,[4] ¶ 83, and provided Barron with copies of the operating
agreements of Harlem Sunshine and East 125[th].  ¶¶ 85, 87.  The Harlem Sunshine operating
agreement stated that Shapiro was the sole owner.  ¶ 85.  The East 125[th] operating agreement
demonstrated Harlem Residential's 25% ownership interest and East 125[th]'s ownership of the
four properties.  ¶ 87.  It also provided that "[n]o Member may Transfer in whole or in part its
Membership Interest without the consent of the Managing Member," and that without the
consent of the Managing Member, any such transfer "shall be null and void and of no legal
effect."  Doc. 44-6 at 28–29.  Shapiro refused to produce Harlem Residential's operating
agreement or other documents showing that Harlem Sunshine was the sole owner of Harlem
Residential, despite Plaintiffs' demand.  ¶ 86.  However, the assignment clearly stated that
Shapiro's 100% interest in Harlem Sunshine, Harlem Sunshine's 100% interest in Harlem
Residential, and Harlem Residential's 25% interest in East 125[th] was sufficient to pledge an
interest in the four properties as collateral for the amounts in escrow.  ¶ 88.  The assignment also
stated that Barron would not lose his rights, title and interest in Harlem Sunshine, Harlem
Residential, East 125[th], and the four properties until MSV approved the received PPE.  ¶ 99.
Shapiro also provided a document entitled "Confidential Offering Memorandum" (the "Offering
Memorandum"), purporting to show Shapiro's assignable interest in the properties.  ¶ 89.

---

[4] The Assignment states that one of the four properties owned by East 125[th] is located at 56 East 126[th] Street; in
contrast, the East 125[th] operating agreement states that its ownership interest is in 58 East 126[th] Street—to date,
Shapiro has not clarified which property is actually owned by East 125[th].  ¶ 93.  The other three properties are
located at 69 E. 125[th] Street, 71 E. 125[th] Street, and 75 East 125[th] St.  ¶ 83.

Shapiro further presented Barron with a document entitled "Guarantee Agreement" which guaranteed repayment of the escrow funds to Barron if, after the expiration of a 30-day period, PAZ was unable to perform its obligations under the SPA.  ¶ 94.  Shapiro demanded that Barron execute the assignment and guarantee agreements that same day.  ¶ 96.  The agreements were then signed on December 7, 2020 and the escrow funds were released to Shapiro.  ¶ 98.

In the 30 days following the execution of the assignment and Guarantee Agreements, MSV did not receive a single shipment of PPE.  ¶¶ 100–01.  Shapiro has not returned the escrow funds to date.  ¶ 102.

In December 2020, Shapiro offered a shipment of gloves to Plaintiffs after another client declined to accept them.  ¶ 103.  MSV, without accepting the shipment itself, offered it to one of its business associates who then declined the gloves upon receipt because they were of extremely poor quality.  ¶¶ 103–04.

Shapiro also represented to Plaintiffs that they would receive a shipment of gloves in January 2021.  ¶ 105.  Based on that representation, Plaintiffs advised MSV's clients that they would in turn receive gloves around January 2021.  *Id.*  Shapiro sent a purported "Bill of Lading" to Plaintiffs on January 7, 2021, which was marked as a draft, and promised to send the original document the next day.  ¶¶ 107–08.  The original was never sent.  ¶ 109.  Shapiro also emailed Plaintiffs on January 12, 2021 with an update noting that two shipments had been booked for arrival by February 8, 2021.  ¶ 110.  Barron held a telephone conference with Shapiro and Zvedeniuk on February 2, 2021 during which they noted that the shipments were again delayed but would eventually arrive.  ¶ 112.

Barron again spoke on the phone with Shapiro on March 11, 2021, who this time was accompanied by Vadim, his business associate.  ¶ 114.  Shapiro and Vadim refused to provide the

status of the shipments.  *Id.*  However, shortly after the phone call, Shapiro advised Plaintiffs that

four shipments were in transit to be delivered to California.  ¶ 115.  Sandiford and one of MSV's

clients traveled to California to inspect the gloves, where they observed that they were poor

quality counterfeits with only 40 gloves per box.  ¶¶ 116–17.  Another client of MSV also

inspected the gloves, advised Plaintiffs that they were counterfeit, and terminated its business

relationship with Plaintiffs.  ¶ 118.  Plaintiffs ultimately rejected the gloves, and Shapiro retained

possession of the gloves but charged Plaintiffs $38,000 for doing so.  ¶¶ 120–21.

      As reflected in shipping schedules, Shapiro has since received multiple shipments of

PPE, allegedly obtained through use of the escrow funds.  ¶¶ 122–23.  Despite Plaintiffs'

demand, Shapiro has failed to produce an accounting of the escrow funds.  ¶ 124.  Instead,

Shapiro sent Plaintiffs a photo of a note purporting to explain how the escrow funds were used. ¶

125; Doc. 43-12.  The note simply reads:



Doc. 43-12.

Plaintiffs allege that Vadim and Boris used the escrow funds to purchase PPE which they then sold to third parties for profit, as confirmed by an anonymous email sent to Barron on August 5, 2021.  ¶ 127; Doc. 44-13.  The email, sent from an email address named castfraud@gmail.com, reads:

> Dear Mark Barron,
>
> It has come to my attention that your company, MSV Synergy LLC, was involved in a PPE nitrile glove transaction with Saadia Shapiro / Paz Global Ventures for approximately 250,000 nitrile glove boxes sometime in 2020.
>
> I am not privy to your specific deal, but I wanted to make you aware that Mr. Shapiro has been involved with defrauding multiple clients and investors in a PPE Nitrile Glove Scam.  None of Mr. Shapiro's clients have ever received the correct nitrile glove[s] promised, and many of his clients paid and received no gloves at all.
>
> I have evidence Mr. Shapiro was purposely importing an inferior, cheaply made "blended glove" with investor money and then re-sold these blended glove containers to another buyer.  Mr. Shapiro then pocketed all the money between himself and his corrupt business partners.  This was purposely planned and coordinated with his primary business associate, Vadim Leybel of Cast Group LLC.
>
> I would very much like to connect you with the other clients that have unfortunately fallen victim to Mr. Shapiro's PPE scam and unethical business practices as well as give you additional information.  There are numerous clients that have lost millions of dollars in his glove scheme.  Is there a contact number to reach you on to further discuss?  I apologize in advance for bringing you this news but I am assuming you might be in the same boat as the other investor/clients.
>
> Sincerely, Paz Global Ventures Whistle Blower

Doc. 44-13.  Plaintiffs have not received gloves or a refund to date, nor do they indicate whether they ever in any way responded to the email.

Plaintiffs also assert more generalized allegations regarding PAZ, Vadim, Boris, Cast, and Zvedeniuk.  ¶¶ 33–59.  Vadim, allegedly also acting on behalf of Boris and Cast, was involved in a fraudulent scheme to sell gloves.  ¶¶ 34–35.  Cast "and/or" PAZ, through Vadim

and Shapiro ("the group"), allegedly misrepresented to customers that Vadim, Boris, and their business associates including Shapiro and Zvedeniuk had close ties to factories in Asia that produced medical grade nitrile gloves.  ¶¶ 35–36.  The group allegedly always knew that they could not procure such gloves, but nonetheless fabricated marketing brochures to perpetuate the fraudulent scheme to sell these gloves during the high demand period of the COVID-19 pandemic.  ¶¶ 37–39.  The group instructed sales associates to pre-sell containers of gloves at a rate of $9.75–$12.00 per box per container, with one container holding 32,000 to 40,000 boxes.  ¶ 40.  Customers generally were required to make a 50% deposit upon signing a contract with the balance to be paid upon shipment.  ¶ 41.  In other circumstances, customer purchase funds were held in escrow by PAZ or Shapiro & Associates until inspection.  ¶ 42.  Cast and PAZ allegedly sold 29 containers of gloves throughout the course of this scheme, but all of the customers received non-medical grade gloves or no gloves at all.  ¶¶ 43–44.  When customers complained, the group fraudulently blamed the factories in Asia for shipping the wrong product. ¶¶ 46–49.  The group would then misrepresent that they were correcting the issue by replacing the containers at no charge and were monitoring the shipments, and in some instances even represented that they had a 50% ownership interest in the factory.  ¶¶ 50–51.  However, customers never received the proper gloves and Vadim and Shapiro refused to return any funds.  ¶¶ 53–54.  Vadim and Shapiro then would repackage the non-medical grade gloves and sell them to new, unsuspecting buyers by contracting with proxy companies whose identities are not yet known.  ¶¶ 55–56.  Plaintiffs allege that this fraudulent scheme has defrauded customers of over $10 million.  ¶ 58.

Plaintiffs bring claims alleging breach of the SPA against PAZ; breach of the escrow agreement against Shapiro and Shapiro & Associates; breach of the assignment and guarantee

agreements against Shapiro; unjust enrichment against Shapiro, Vadim, Boris, Zvedeniuk, PAZ, and Cast; negligent misrepresentation, fraud, and fraudulent inducement against Friedman, Shapiro, Vadim, Zvedeniuk, PAZ, and Shapiro & Associates; breach of the implied covenant of good faith and fair dealing against PAZ, Shapiro, and Shapiro & Associates; and fraudulent inducement as to the arbitration provision in the SPA against PAZ, Shapiro, Vadim, and Shapiro & Associates.

Shapiro, Shapiro & Associates, and PAZ move to compel arbitration and to dismiss for lack of subject matter jurisdiction and failure to state a claim, Doc. 51; East 125[th] moves to dismiss the first amended complaint for failure to state a claim, Doc. 48; and Vadim and Cast move to dismiss for failure to state a claim, Doc. 56.[5]

## II.   MOTIONS

### A.   *Shapiro, Shapiro & Associates, and PAZ Motion to Compel Arbitration*

#### 1.   *Motion to Compel Legal Standard*

Section 4 of the Federal Arbitration Act requires courts to compel arbitration in accordance with the terms of the arbitration agreement upon the motion of either party to the agreement, provided that there is no issue regarding its creation.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (citing 9 U.S.C. § 4).  Whether the parties agreed to arbitrate is generally a question decided by the court unless the parties "clearly and unmistakably provide otherwise."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

---

[5] The status of the remaining five defendants is as follows:
- Following the original complaint, the Court issued a summons as to Harlem Sunshine and Harlem Residential on October 14, 2021, Docs. 13 and 14.  As of this date, they have not been served.
- Zvedeniuk has not been served, nor has a summons issued.
- Counsel for Friedman filed a notice of appearance on August 10, 2022.  Doc. 85.  The Court then granted Friedman's request for an extension of time to answer the complaint to September 14, 2022.  Doc. 88.
- Counsel for Boris filed a notice of appearance on August 7, 2022.  Doc. 83.

Determinations of arbitrability may be delegated to an arbitrator "if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Shaw Grp. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (internal quotation marks and emphasis omitted)).  In the absence of clear and unmistakable evidence that the parties intended to submit the question of arbitrability to the arbitrator, courts assume they, not arbitrators, were intended to decide "certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003).

To determine whether to compel arbitration, the Court must weigh four primary considerations:  "(1) whether the parties in fact agreed to arbitrate; (2) the scope of the arbitration agreement; (3) if the parties assert federal statutory claims, whether Congress intended those claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342 (S.D.N.Y. 2014) (citing *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)), *aff'd*, 633 F. App'x 544 (2d Cir. 2015).  "A party resisting arbitration on the grounds that the arbitration agreement . . . does not encompass the claims at issue[] bears the burden of proving such a defense."  *Kulig v. Midland Funding, LLC*, 13 Civ. 4715 (PKC), 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13, 2013) (citing *Green Tree Fin Corp. v. Randolph*, 531 U.S. 79, 92 (2000)).

Moreover, "[f]ederal policy strongly favors arbitration as an alternative dispute resolution process," so "any doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration," and "[f]ederal policy requires [courts] to construe arbitration clauses as broadly as possible." *Collins & Aikman Prods Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (quotations omitted). "[U]nless it may be said with positive assurance that the arbitration clause" does not cover the disputed issue, the court must compel arbitration. *Id.* (quoting *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 932 F.2d 245, 250 (2d Cir. 1991)).

   *2.  Discussion*

   Shapiro, Shapiro & Associates, and PAZ jointly move to compel Plaintiffs to arbitrate the claims under the arbitration agreement in the SPA.  The SPA states that "any dispute" between the parties "shall be resolved by arbitration according to the rules of the American Arbitration Association."  Doc. 44-1 at 7.  Further, the escrow agreement states that it "is not intended to amend or supersede any provision" of the SPA.  Doc. 44-2 at 10.  Lastly, they argue that the SPA, escrow, and guarantee agreements are part of one "global" transaction executed simultaneously to facilitate purchase of the PPE.  Therefore, they argue that Plaintiffs are required to arbitrate their claims under the SPA, the escrow agreement, and the guarantee agreement.  In support, they cite *Freeford Ltd. v. Pendleton*, 857 N.Y.S.2d 62 (N.Y. App. Div. 2008) ("parties to a 'global transaction' who are not signatories to a specific agreement within that transaction may nonetheless benefit from a forum selection clause contained in such agreement if the agreements are executed at the same time, by the same parties or for the same purpose.").

   In response, Plaintiffs argue that the contracts, including the arbitration provision within, are void due to an unmet condition precedent.  Where there is "a condition precedent to the formation or existence of the contract itself . . . no contract arises unless and until the condition occurs."  *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415 (N.Y. 1995)

(internal quotation marks and citation omitted).  Here, the SPA stated that "[t]he Seller and Buyer hereby record that they are not subject to any pending or threatened litigation . . . that could interfere with its performance of this SPA."  Doc. 44-1 at 7.  However, Shapiro informed Plaintiffs in November 2020, within weeks of signing the SPA, that PAZ could not deliver the gloves due to pending litigation with its supplier.  ¶ 74.

The Second Circuit has stated that "conditions precedent are not readily assumed.  While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.'"  *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer*, 660 N.E.2d 415 (internal quotation omitted)).  Courts thus "interpret doubtful language as embodying a promise or constructive condition rather than an express condition."  *Id.*  Here, the language Plaintiffs point to as a condition precedent simply is not "unmistakable language" that the contract would not arise unless the condition of no pending or threatened litigation was fulfilled.  Accordingly, even assuming that the moving parties breached this provision,[6] breach would not void the contract.[7, 8]

Plaintiffs next argue that, if not void, the arbitration clause is voidable due to Defendants' fraudulent inducement.  Specifically, Plaintiffs allege that Defendants "disguised" the arbitration provision in the SPA by inserting an inapplicable jurisdiction and venue selection provision in the escrow agreement which was immediately overridden by the contemporaneously-signed

---

[6] The Court does not reach this issue.

[7] The Court does not reach the issue of whether Plaintiffs waived the argument of condition precedent by not pleading it in the complaint as it finds that, even if properly argued, Plaintiffs' argument has no merit.

[8] The Court further notes that "a challenge to the validity of a contract as a whole . . . must go to the arbitrator." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (U.S. 2006).

SPA.  *See* Doc. 44-1 at 9 (the SPA "contains the entire agreement of the Parties . . . and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions."); Doc. 44-2 at 8, 10 (the escrow agreement stated that "all actions or proceedings arising in connection with [it] be tried and litigated exclusively in the federal courts located in New York" but also stated that it was "not intended to amend or supersede any provision of the [SPA].").[9]  Defendants argue in response that the SPA's arbitration provision was not disguised, as it comprised four paragraphs of the agreement and was duly negotiated and reviewed by Plaintiffs.  Doc. 44-1 at 8.  Further, the SPA clearly stated that it superseded the escrow agreement.  *Id.* at 9.  The Court agrees that Plaintiffs' arguments are without merit. While the two venue provisions in the SPA and escrow agreement arguably conflict, other provisions clarify that (1) the SPA supersedes the escrow agreement, and (2) the escrow agreement does not supersede the SPA.  This makes clear that the arbitration provision applies. Accordingly, Plaintiffs' claims related to the SPA, escrow agreement, and guarantee agreement[10] are subject to the arbitration provision in the SPA and the moving parties' motion to compel is granted.  The motion to dismiss is denied without prejudice to renewal pending the outcome of arbitration.

   *B.  Motions to Dismiss*

        East 125th and Vadim and Cast separately move to dismiss the FAC for failure to state a claim.  Docs. 48, 56.

---

[9] Plaintiffs' last argument is that the escrow agreement is not subject to the SPA provision stating that it supersedes the escrow agreement because that paragraph states that "[n]othing in this clause shall limit or exclude any liability for fraud."  Plaintiffs thus argue that because their FAC sounds in fraud, it should not be dismissed from federal court.  This argument has no merit, as a dismissal by this court would not "limit or exclude any liability for fraud" but simply redirect it to the appropriate venue of arbitration for resolution.

[10] Plaintiffs do not oppose the movants' argument that all three agreements constitute a global agreement.

*1.  Motion to Dismiss Legal Standard*

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

*2.  East 125th Motion to Dismiss*

Plaintiffs do not assert any claims against East 125th. Accordingly, there are no claims for the Court to dismiss. *See Lim Tung v. Deutsche Bank Trust Co.*, No. 19 Civ. 5445 (RPK) (SJB), 2022 WL 471907, at *1 n.4 (E.D.N.Y. Jan. 11, 2022) (declining to consider a motion to dismiss on behalf of a party against whom no claims were brought despite being mentioned in the factual allegations). However, even overlooking this omission (whether inadvertent or not), Plaintiffs have not sufficiently stated a claim against East 125th. East 125th is mentioned only insofar as Harlem Residential possesses a 25% interest in it, ¶ 13, and East 125th owns the four

properties that Shapiro assigned to Plaintiffs, ¶¶ 83–84.  Shapiro gave Plaintiffs a copy of East

125th's operating agreement to demonstrate that relationship, ¶ 87, but there are no allegations

that East 125th itself ever actively participated in or even had knowledge of any of the alleged

fraudulent activities.  Plaintiffs summarily allege that Shapiro "purported to have actual authority

to act on behalf of . . . East 125[th]," ¶ 90, but this is not sufficient to state a claim under an

agency theory or to allege an alter ego and pierce the corporate veil.  *See Nuevo Mundo Holdings*

*v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 613 (GBD), 2004 WL 112948, at *5 (S.D.N.Y.

Jan. 22, 2004) ("Without any further factual allegations [beyond summary allegations of

agency], plaintiffs' complaint fails to support a bald assertion that an agency relationship

existed[.]"); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 403 (S.D.N.Y. 2007) ("[C]onclusory

allegations of an alter ego are insufficient to survive a motion to dismiss.") (internal citations

omitted).

　　　　In an effort to avoid dismissal, Plaintiffs argue that East 125th is a necessary party to this

action under Rule 19(a)(1) because East 125th owns the property that serves as collateral for the

allegedly fraudulently obtained funds at issue in this case.  Fed. R. Civ. P. 19(a)(1).  Plaintiffs

state that "[t]he only way to protect [their interest in the property] is through the inclusion and

appearance of East 125th in this lawsuit."  The Court disagrees.  As East 125th points out,

Plaintiffs seek primarily money damages in this action,[11] Doc. 44 at 29–30, so ownership or

interest in the properties is irrelevant.  Further, "[f]ederal courts interpreting Rule 19(a) have

made absolutely clear that it is not necessary for all joint tortfeasors to be named as defendants in

a single lawsuit."  *Jerez v. Cooper Indus., Inc.*, No. 01 Civ. 10119 (NRB), 2003 WL 22126893,

---

[11] The only other relief sought is a declaration that the arbitration provision in the SPA is voidable, Doc. 44 at 30.

at *1 (S.D.N.Y. Sept. 12, 2003) (collecting cases). East 125[th] is simply not necessary to this action. Accordingly, East 125[th]'s motion to dismiss is granted.

### 3. *Vadim and Cast Motion to Dismiss*

Plaintiffs bring claims for unjust enrichment against both Vadim and Cast as well as claims for negligent misrepresentation, fraud, and fraudulent inducement against Vadim. Vadim and Cast move to dismiss these claims.

### a. *Fraud and Fraudulent Inducement Claims against Vadim*

Vadim and Cast first argue that the fraud and fraudulent inducement claims against Vadim should be dismissed. To state a claim of common law fraud under New York law, a plaintiff must allege that the defendant made "(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015). "A claim for common law fraud is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)," *id.* at 402–03, which requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Specifically, to meet this requirement, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). Similarly, to state a claim for fraudulent inducement under New York law, a claimant must allege that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon

the statement and was induced by it to engage in a certain course of conduct; and (5) as a result

of such reliance plaintiff sustained pecuniary loss." *Stephenson v. PricewaterhouseCoopers,*

*LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order)

(internal quotation marks and citation omitted); *Amida Capital Mgmt. II, LLC v. Cerberus*

*Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (stating that the fraudulent

inducement elements are similar to common law fraud elements).  In addition, "the [c]omplaint

must . . . state with particularity the circumstances of the fraud under Rule 9(b) and contain

sufficient facts, accepted as true, to state claims for relief for common-law fraud that are facially

plausible under Rule 8(a)(2)."  *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 700–01

(S.D.N.Y. 2012).

　　　While a fraud claim may plead scienter generally, the plaintiff "must still allege facts that

give rise to a strong inference of fraudulent intent."  *Colpitts v. Blue Diamond Growers*, 527 F.

Supp. 3d 562, 585 (S.D.N.Y. 2021) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d

453, 472 (S.D.N.Y. 2020)).  This inference may be established by (1) "alleging facts to show that

defendants had both motive and opportunity to commit fraud," or (2) "alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*

(quoting *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 353 (S.D.N.Y. 2020)).

　　　Vadim and Cast argue that Plaintiffs have not identified a single false statement allegedly

made by Vadim, nor do they state where or when such statements were made.  The only

potentially relevant allegation is that Vadim refused to provide the status of the shipments, ¶ 114,

but there is no statement that could be fraudulent by such refusal.  While Plaintiffs do generally

plead that Cast and PAZ through Vadim and Shapiro engaged in a fraudulent scheme to sell

gloves, ¶¶ 33–59, these allegations are far too general to impose liability, as they do not "state

with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Plaintiffs vaguely allege that the allegedly fraudulent scheme was directed towards "customers, including Plaintiffs" and "unsuspecting buyers," with no specific allegations as to the speaker or time of the allegedly fraudulent statements.  ¶¶ 35, 55.  Further, Plaintiffs do not sufficiently allege that they reasonably relied on the statements made throughout the course of the fraudulent scheme, as it is not even clear which statements were directed at Plaintiffs as opposed to other, unidentified customers.

Plaintiffs do not sufficiently address Vadim and Cast's main argument, as they do not cite to any particular allegedly fraudulent statements made by any particular defendant in support of their arguments.  While Plaintiffs have vaguely described an allegedly fraudulent scheme, they have not provided sufficient detail to satisfy Rule 9(b).  Plaintiffs simply respond that they need only allege a "general time period" during which the misrepresentation were made to satisfy Rule 9(b).  *See Int'l Paper Co. v. James*, No. 81 Civ. 4780 (LBS), 1989 WL 240079, at *9 (S.D.N.Y. Oct. 12, 1989) (finding that the plaintiff complied with Rule 9(b) by alleging that fraudulent statements were made "throughout 1981 up to mid-May 1981").  Plaintiffs also argue that they have alleged that the events underlying this lawsuit spanned from September 2020 through March 2021.  However, Plaintiffs' arguments are unavailing.  The entire section of the FAC focusing on Vadim's conduct in conjunction with Cast, PAZ, Boris, and Shapiro, ¶¶ 33–59, unlike the complaint in *Int'l Paper Co.*, does not contain a single date, nor is it specific enough to satisfy Rule 9(b).  Accordingly, the claims for fraud and fraudulent inducement are dismissed.

b.  *Negligent Misrepresentation Claim Against Vadim*

"To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct

information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'"  *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

"Under the 'duty' element, 'New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity.'"  *Anschutz Corp.*, 690 F.3d at 114 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)).  To establish such a privity-like relationship under New York law, a plaintiff must plead:  "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance."  *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318, 321–22 (N.Y.1 992) (citing *Credit All. Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985)); *see also JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401 (S.D.N.Y. 2004).

"Because negligent misrepresentation sounds in fraud, it is subject to Rule 9(b)'s heightened pleading standard" as well.  *Yoomi Babytech, Inc. v. Anvyl, Inc.*, No. 20 Civ. 7933 (ER), 2021 WL 4332258, at *12 (S.D.N.Y. Sept. 22, 2021) (citation omitted).  As the Court has held that the FAC does not satisfy Rule 9(b), the negligent misrepresentation claim must also be dismissed.

Even if the FAC properly pleads fraud, Plaintiffs have not alleged the required "special relationship" between themselves and Vadim.  The FAC does state in a conclusory fashion that "there exists a special relationship between Barron and [Vadim]," ¶ 158, but conclusory allegations are not sufficient to survive a motion to dismiss.  Further, "arms-length commercial transactions" generally do not give rise to negligent misrepresentation claims.  *Izquierdo v. Mondelez Int'l, Inc.*, No. 16 Civ. 4697 (CM), 2016 WL 6459832, at *8 (S.D.N.Y. Oct. 26, 2016) (citing *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996)).  The relationship between Vadim and Plaintiffs is even more attenuated than a commercial transaction since Plaintiffs contracted with PAZ, not Vadim.  *See Izquierdo*, 2016 WL 6459832, at *9.  While Plaintiffs argue that Defendants' "specialized expertise" creates a special relationship, *see Kimmell*, 675 N.E.2d 450 ("liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise . . . ."), there are no allegations regarding specialized expertise on the part of Vadim or any other defendant in the FAC.  Accordingly, the negligent misrepresentation claim is dismissed.[12]

      c.   *Unjust Enrichment Claims*

Vadim and Cast argue that the unjust enrichment claims against them should be dismissed.[13]  To state a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiffs' expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.  *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005).

---

[12] The Court declines to consider the Shapiro Affidavit or convert this motion to dismiss into a motion for summary judgment as requested by Plaintiffs.  Even if the Court were to consider the Affidavit, it does not sufficiently advance Plaintiffs' allegations.  Shapiro testifies regarding the role of various defendants, but adds nothing demonstrating that the defendants purported to have specialized expertise.  *See generally* Doc. 64.

[13] Vadim and Cast first argue for dismissal of this claim as duplicative of the fraud claims.  As the Court has now dismissed the fraud claims, it will not dismiss the unjust enrichment claim on this basis.

"The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905 (N.Y. App. Div. 1999)).  Vadim and Cast argue that Plaintiffs have not alleged that defendants were enriched in any way.

The FAC states that Vadim, along with Shapiro and Boris, used Plaintiffs' escrow money to purchase and sell PPE to third parties for a profit, ¶ 127, an allegation asserted upon information and belief and supported by an anonymous email, Doc. 44-13, alleging the same. These allegations fail to state a claim.  It is not clear how Vadim in particular was enriched at Plaintiffs' expense, particularly in light of the fact that the escrow funds are only ever alleged to be under the control of Shapiro & Associates or Shapiro.  Vadim's role in using Plaintiffs' escrow funds is never explained.  Accordingly, the claim is dismissed.

Further, as to Cast, the FAC merely states that Cast "substantially benefited from" the escrow funds.  ¶ 155.  This conclusory allegation is plainly insufficient to survive a motion to dismiss.  Accordingly, the unjust enrichment claims are dismissed.

## III.   CONCLUSION

For the foregoing reasons, Shapiro, Shapiro & Associates, and PAZ's motion to compel arbitration is GRANTED.  This action is hereby STAYED pending arbitration as to Shapiro, Shapiro & Associates, and PAZ, and the parties are directed to advise the Court within 48 hours of the outcome of the arbitration.  East 125[th]'s motion to dismiss is GRANTED.  Vadim and Cast's motion to dismiss is GRANTED.  Plaintiffs may file an amended complaint in accordance with the Court's guidance above by September 28, 2022.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 48, 51, and 56.

It is SO ORDERED.

Dated:   September 7, 2022
New York, New York

_____

EDGARDO RAMOS, U.S.D.J.