UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MSV SYNERGY, LLC and MARK BARRON,

                           Plaintiffs,

                       v.

SAADIA SHAPIRO, SHAPIRO & ASSOCIATES
ATTORNEYS AT LAW, PLLC, and PAZ
GLOBAL VENTURES, LLC,

                           Defendants.

**OPINION AND ORDER**
21 Civ. 7578 (ER)

RAMOS, D.J.:

      MSV Synergy LLC ("MSV") and Mark Barron brought this action on September 10, 2021 against Saadia Shapiro, his law firm Shapiro & Associates, PAZ Global Ventures, LLC ("PAZ"), and other parties,[1] raising various claims regarding an alleged fraudulent scheme whereby Defendants induced Barron to pay $2 million in exchange for personal protective equipment ("PPE") that was never received.  Doc. 1.  On September 7, 2022, the Court granted the motion to compel arbitration brought by Shapiro, Shapiro & Associates, and PAZ, and stayed this case while the parties proceeded to arbitration.  Doc. 89.  On May 13, 2024, the Arbitrator issued an award (the "Award") in favor of MSV and Barron.[2]  Doc. 133-12.  Now pending before the Court are Plaintiffs' motion to lift the stay and confirm the Award, and Defendants Shapiro[3] and PAZ's cross-motion to vacate the Award.  Docs. 132, 144.  For the reasons set forth below, the Award is CONFIRMED, and Defendants' motion to vacate the Award is DENIED.

---

[1] The action was initially brought against ten defendants, and an eleventh defendant was added in the amended complaint.  Docs. 1, 44.  Plaintiffs filed notices of voluntary dismissal as to all defendants except Shapiro, Shapiro & Associates, and PAZ, which the Court approved on November 13, 2022 and January 12, 2023.  Docs. 106, 114.

[2] There is no indication in the record as to what disposition, in any, was reached as to defendant Shapiro & Associates.

[3] While Shapiro and PAZ submit a joint motion to vacate, Shapiro, a licensed attorney, appears *pro se*.  Doc. 144 at 4.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The Court assumes familiarity with the facts set forth in its September 7, 2022 opinion and order granting the motion to compel arbitration.  Doc. 89.

A.  **The Parties and Their Transactions**

MSV is a limited liability company that imports and sells PPE.  Doc. 44 ¶¶ 6, 19. Barron, a professional football player, has a 50% membership interest in MSV and serves as the primary financier of the company.  *Id.* ¶¶ 7, 20.  Saadia Shapiro, an attorney licensed in New York, is a managing partner at Shapiro & Associates.  *Id.* ¶¶ 8–9. Shapiro also operates a side business of manufacturing PPE and shipping it internationally.  *Id.* ¶ 21.  PAZ is a limited liability company with its principal place of business in New York.  *Id.* ¶ 10.  Shapiro is the sole member of PAZ.  *Id.*; Doc. 146 at 2.

On October 30, 2020, MSV signed a Sale and Purchase Agreement (the "SPA") drafted by PAZ wherein MSV agreed to buy 250,000 boxes, each containing 100 medical gloves, from PAZ, to be delivered to a site within 25 miles of the New York/New Jersey Metropolitan area.  *Id.* ¶¶ 61, 69, 116; Doc. 133-1 § 2(i).  PAZ was required to finance the export and import operations.  Doc. 44 ¶ 68.  The SPA required any amendments to be made in writing and signed by both parties.  Doc. 133-1 §§ 4(ii), 16(i).  In the event of a breach, the SPA also required the claimant to notify the other party, in writing, within fourteen days of the breach.  *Id.* § 12(i).  The SPA included a force majeure clause, protecting the seller, PAZ, from liability for failure to perform, should "the delay or failure result[] from events or circumstances outside its reasonable control."  *Id.* § 10. The SPA included an arbitration clause, stipulating that "any dispute" between the parties would "be resolved by arbitration according to the rules of the American Arbitration Association."  *Id.* § 15(ii).  The SPA also included an integration clause, which stated that it "contains the entire agreement of the Parties . . . and supersedes all prior written and

2

oral agreements, and all contemporaneous oral agreements, relating to such transactions." *Id.* § 16(v).

The SPA required PAZ and MSV to enter into a separate "escrow agreement/paymaster agreement." *Id.* § 7(A)(i).  The escrow agreement required the purchase funds to be held in escrow until the goods were delivered to the New York/New Jersey region, inspected, and approved by Barron, and until Barron provided written consent for the funds to be released.  Docs. 44 ¶¶ 63–64, 69–70; Doc. 160-2.  It further required that the "[f]unds for each shipment shall be released separately from escrow" and that they be disbursed to "[PAZ's] nominated bank account."  Doc. 160-2 § 1.  The Escrow Agent[4] could only be held liable for "damages arising out of its own gross negligence or willful misconduct," and it was additionally protected from liability by a force majeure clause.  *Id.* §§ 8(b), 26.  While the escrow agreement required that "all actions or proceedings arising in connection with [it] be tried and litigated exclusively in the federal courts located in New York," it also stated that it was "not intended to amend or supersede any provision of the [SPA]."  *Id.* §§ 15, 21.

On October 30, 2020, in accordance with the SPA and escrow agreement, MSV wired $2,000,000 to Shapiro & Associates' trust account to be held in escrow.  Doc. 44 ¶ 62; Doc. 160-8.  Shapiro told Plaintiffs that shipments would be received in as few as three or four weeks after execution of the SPA and escrow agreement, but no later than 45 days.  Doc. 44 ¶ 71.  Also in October 2020, Shapiro told Plaintiffs that shipments from Guangdong, China were "on the water" and "ahead of schedule."  *Id.* ¶¶ 73, 75.  However, in November 2020, Shapiro informed Plaintiffs that the gloves would not be

---

[4] The escrow agreement identified Shapiro & Associates as Escrow Agent, and Shapiro signed the agreement on behalf of the firm.  Doc. 160-2 at 1, 11.

delivered due to ongoing litigation related to his supply of PPE.[5]  *Id.* ¶ 74.  On December 7, 2020, Shapiro stated in an email to MSV that PAZ could instead import four shipments of gloves from China that would not be medical-grade, as well as four shipments from Thailand that *would* be comprised of medical-grade gloves conforming to the SPA.  *Id.* ¶¶ 75, 77.  He represented that he was opening a new office in Thailand and had a business associate stationed at the manufacturing plant who could inspect the gloves.  *Id.* ¶ 76.

According to the amended complaint, in approximately late November or early December 2020, Shapiro stated that he was having difficulty procuring funds for the first four shipments from China.  *Id.* ¶ 78.  In a December 7, 2020 email, Shapiro demanded that Plaintiffs release the escrowed funds to pay for the eight shipments, and stated that if the funds were released, MSV could receive as many shipments of gloves as it wanted within 13 to 17 days.  *Id.* ¶¶ 79–80.  Barron declined to do so unless Shapiro pledged collateral to cover the amount, so Shapiro drafted a conditional assignment of his membership interest in multiple properties as collateral for the amounts in escrow.  *Id.* ¶¶ 81–88.  The assignment agreement also stated that Barron would not lose his rights, title and interest in the properties until MSV approved the PPE that was delivered.  *Id.* ¶ 99.  Shapiro further presented Barron with a document entitled "Guarantee Agreement" which guaranteed repayment of the escrow funds to Barron if PAZ was unable to perform its obligations under the SPA.  *Id.* ¶ 94; Doc. 133-3.  The guarantee agreement specified that "[r]epayment of the investment shall take place no later than 30 days after it is reasonably concluded that the investment has failed."  Doc. 133-3 ¶ 1.  The guarantee and

---

[5] Defendants presumably referred to the litigation they describe in their motion to vacate:  "Paz, like 67 other plaintiffs, were victims of a massive fraud that was perpetrated by the owners and operators of the factory in China that was tasked with manufacturing the Gloves.  A Judgment was issued in favor of Paz and the other victims[.]"  Doc. 146 at 12.

assignment agreements were executed by December 14, 2020,[6] and the escrow funds were released to Shapiro. *Id.* ¶ 98. In the 30 days following the execution of the assignment and guarantee agreements, MSV did not receive a single shipment of PPE. *Id.* ¶¶ 100–01. Nonetheless, Shapiro did not return the escrow funds. *Id.* ¶ 102.

In a January 12, 2021 email to MSV and Barron regarding shipping delays, Shapiro wrote that "Mark released the money on December 17. 45 days from then is February 2," and "the goods should arrive on February 8," so despite the seemingly "endless delays," they were actually "on time and keeping within the schedule of delivery of approximately 45-60 days." Doc. 155-3 at 2. However, as of March 11, 2021, no gloves had arrived, and when Plaintiffs phoned Defendants, Defendants refused to provide them with any expectation as to when a shipment might be received. Doc. 44 ¶¶ 114. Defendants then advised Plaintiffs that four containers of non-medical gloves were in transit to California. Doc. 133-12 at 12; Doc. 44 ¶ 115. Plaintiffs flew to California to inspect them, and found the gloves to be "counterfeits . . . of extremely poor quality and with only 40 gloves per box whereas the SPA required the delivery of boxes containing 100 gloves per box." Doc. 44 ¶ 116–117. MSV promptly rejected the shipment. *Id.* ¶ 120. In a March 23, 2021 email to a business associate, Shapiro acknowledged, "we must give those first four containers to Barren [sic] otherwise returned [sic] $2M to him immediately." Doc. 133-12 at 12. Still, no funds were returned to Barron.

Shapiro allegedly continued to purchase PPE with the escrow funds, but he refused to produce an accounting of the escrow funds. Doc. 44 ¶¶ 122–124. Instead,

---

[6] The guarantee agreement was executed on December 14, 2020. *See* Doc. 44-7. The parties do not specify on what date the assignment agreement was executed, and Plaintiffs provide only the un-signed copy, dated December 7, 2020. *See* Doc. 44-4. However, Plaintiffs confirm in the amended complaint that the assignment agreement was in fact executed, thus causing the release of the escrow funds to Shapiro. Doc. 44 ¶ 98.

Shapiro sent Plaintiffs a photo of a note purporting to explain how the escrow funds were used.  *Id.* ¶ 125; Doc. 43-12.  The note simply reads:



Doc. 43-12.  Indeed, Shapiro wired $992,000 and $983,000 from the escrow account to "Glover Court Pty Ltd," an Australian company dedicated to importing PPE from Asia to the U.S., on December 17, 2020 and January 13, 2021, respectively.  Docs. 133-12 at 11, 160-9.  Between December 30, 2020 and January 13, 2021, Glover Court in turn transferred $194,2720 to a factory in China called Guangdong Shenyan New Material Tech, and on January 21, 2021, Glover Court additionally transferred $788,000 to a factory in Thailand called HN Medical Group Co., LTD.  Doc. 133-12 at 22; Doc. 160 ¶ 23; Docs. 160-10, 160-11.

In a May 19, 2021 letter to Shapiro, MSV and Barron's lawyer demanded that Shapiro return the escrow funds pursuant to the SPA, escrow, and guarantee agreements. Doc. 44 ¶ 128; Doc. 155-6.  On June 17, 2021, Shapiro emailed MSV that "[t]hree containers for Mark Barron," located in a California warehouse, were ready for Plaintiffs

to inspect and pick up.  Doc. 145-4.  Shapiro also wrote, "[c]all me any time to create a schedule for the balance owed to Mark."  *Id.*  That evening, Barron replied:

> "I'm assuming that you receiving the letter from my lawyer played a part in you offering these gloves.  I want to make clear once and for all . . . we DO NOT want gloves at this point being that the market is no longer what it was when our business was initiated . . . .  I find it telling that once there is an official threat of the lawsuit taking place, you now all of a sudden have 100,000 boxes to just offer up."

Doc. 145-6.  On July 12, 2021, Shapiro emailed Barron offering four more containers, one ready to be inspected in a California warehouse and the other three available to be "directed to the place of [his] choosing."  Doc. 145-7.  An MSV representative rejected the gloves again, adding, "All I want to do is get Mark back his Principle [sic] right away."  *Id.*

Plaintiffs alleged in their amended complaint that the escrow funds were used to purchase PPE which was then sold to third parties for profit, as confirmed by an anonymous email sent to Barron on August 5, 2021.  Doc. 44 ¶ 127; Doc. 44-13.  The email, sent from email address castfraud@gmail.com and signed "Paz Global Ventures Whistle Blower," noted:

> I wanted to make you aware that Mr. Shapiro has been involved with defrauding multiple clients and investors in a PPE Nitrile Glove Scam.  None of Mr. Shapiro's clients have ever received the correct nitrile glove[s] promised, and many of his clients paid and received no gloves at all.
>
> I have evidence Mr. Shapiro was purposely importing an inferior, cheaply made "blended glove" with investor money and then re-sold these blended glove containers to another buyer.  Mr. Shapiro then pocketed all the money between himself and his corrupt business partners.

Doc. 44-13.

By the time Plaintiffs filed their complaint on September 10, 2021, they had not been returned any of the $2 million they provided to Defendants on October 30, 2020, nor provided with any medical gloves conforming to the SPA.  Doc. 44 ¶¶ 53–54, 59.

### B. Procedural History and Arbitration Proceedings

MSV and Barron brought this action against Shapiro, Shapiro & Associates, PAZ, and other parties on September 10, 2021, and they amended their complaint on January 26, 2022. Docs. 1, 44. The amended complaint included claims against PAZ for breach of the SPA, against Shapiro and Shapiro & Associates for breach of the escrow and guarantee agreements, and against Shapiro, PAZ, and other parties for unjust enrichment, negligent misrepresentation, fraud, and related claims. On February 16, 2022, Shapiro, Shapiro & Associates, and PAZ filed a motion to compel arbitration. Doc. 51. In that motion, they argued that the SPA's arbitration clause covering "all disputes" is "explicit, clear and broad," and "applicable to the Escrow Agreement" based on the disclaimer in that agreement that it "is not intended to amend or supersede any provision of the [SPA]." Doc. 54 at 8. Therefore, Defendants argued, "even-though [sic] the dispute will not be litigated in Court due to the arbitration provision, the Plaintiff[s] will have complete redress and justice through arbitration." *Id.* at 11.[7] On September 7, 2022, the Court granted the motion to compel and stayed the action pending arbitration, agreeing with Defendants that "Plaintiffs' claims related to the SPA, escrow agreement, and guarantee agreement are subject to the arbitration provision in the SPA." Doc. 89 at 14.

On November 21, 2022, Plaintiffs filed their demand for arbitration. Doc. 133 ¶ 10; Doc. 133-4. In the demand's "brief description of the claims," Plaintiffs alleged that PAZ breached the SPA and Shapiro breached the guarantee agreement. Doc. 160-17. Plaintiffs did not file a separate complaint in the arbitration. *See* Doc. 133-12 at 5 n.1. Defendants filed a joint answer with defenses and counterclaims against MSV and

---

[7] In Plaintiffs' opposition to Defendants' motion to compel arbitration, they argued that the arbitration clause in the SPA was voidable based on fraud in the inducement; they argued Defendants "disguised" the SPA clause "by inserting the jurisdiction and venue selection provision in the Escrow Agreement," thereby making the SPA "cleverly supersed[e]" the right to litigate in court which the escrow agreement appeared to confer on Plaintiffs. Doc. 67 at 5. They also argued, in the alternative, that the SPA did not supersede the escrow agreement, per the SPA's disclaimer that it did not "limit or exclude any liability for fraud." *Id.*

Barron. *See* Doc. 133-12 at 5. The counterclaims were ultimately dismissed. *See id.* at

28. On or about February 26, 2024, the parties submitted witness statements as well as

pre-hearing memoranda. *See id.* at 4. The evidentiary hearing was held on March 4 and

6, 2024, and included testimony from Barron, two other MSV representatives, Shapiro,

and rebuttal witness Al Germain,[8] as well as "dozens of documents" that the parties

submitted as evidence. Doc. 133 ¶¶ 14–15. The Arbitrator noted at the conclusion of the

hearing that she would only consider the exhibits used therein. *Id.* ¶¶ 16; Doc. 133-7 at

86. Nonetheless, she subsequently agreed to accept an additional document that Shapiro

submitted on March 7, which he asserted would undermine Germain's testimony. Doc.

133 ¶¶ 17–18; Docs. 133-8, 133-9.

The parties submitted post-hearing memoranda on April 26, 2024. *See* Docs.

133-12 at 4, 145-26. On April 29, 2024, the Arbitrator emailed the parties with a list of

questions based on her review of their post-hearing briefs. Doc. 155-1. These included

whether Shapiro could be held personally liable for a breach of contract by PAZ

regardless of whether Plaintiffs made a "veil-piercing" argument, whether Plaintiffs

waived the 25-mile-radius delivery requirement by inspecting the March 2021 shipment

in California, whether the transaction "failed" given Defendants offered seven shipments

in June and July of allegedly conforming goods, and what constituted a "reasonable time"

for delivery of goods pursuant to the SPA. *Id.* In the same April 29 email, the Arbitrator

offered that the parties could reply to the questions in writing or through oral argument,

and she provided dates on which she could convene a hearing, if requested. *Id.* Both

Plaintiffs and Defendants opted to respond to the questions in writing, each submitting a

---

[8] Germain, an independent sales associate, testified about his own clients' experience ordering and paying for—but never receiving—PPE from Cast Group, a PPE importer to the U.S. that worked with Shapiro. Doc. 133-12 at 23–24. He testified that while he never met Shapiro, he was copied on emails between him and Germain's clients, and that Shapiro told him "he was a lawyer working with [Cast] and was an escrow attorney, and he handled contracts and money for escrow." *Id.*

supplemental post-hearing memorandum on May 10 and May 13, 2024, respectively.

Docs. 133-11, 160-19.  Included in Defendants' supplemental post-hearing memorandum

was their argument that Plaintiffs did not assert a breach of contract claim against Shapiro

stemming from PAZ's alleged breach of the SPA.  Doc. 160-19.  Defendants also

explained that they had brought up veil-piercing in their Proposed Findings of Fact and

Conclusions of Law, to avoid being "blindsided with such a claim . . . with no

opportunity to respond."  *Id.* ¶ 1.[9]  On May 14, 2024, the Arbitrator declared the hearing

closed.  *See* Doc. 134 at 3.

On June 3, 2024, the Arbitrator issued her award in favor of MSV and Barron.

Doc. 133-12.  Based on her review of the "extensive evidence and briefing presented by

all parties," the Arbitrator found:  "Shapiro took the money from Barron; he did not

produce the goods in the manner required by the contract, and he did not return Barron's

money despite several admissions that he knew he owed the money."  *Id.* at 6, 24–25.  In

particular, and as relevant to the instant motions, the Arbitrator made the following

determinations:

- **PAZ breached the SPA by failing to timely deliver the agreed-upon goods to the New York/New Jersey region.**  The Arbitrator first determined that any delivery of goods was untimely since the parties' various communications evidenced an expected delivery time of 45-60 days.  *Id.* at 14.  In considering the applicability of the force majeure clauses, she concluded that "even accounting for shipping problems, a delay from December to June (six months)" based on the March 2020 pandemic was "not reasonable, particularly given the fact that [PAZ] continually received gloves from China in late 2020 and early 2021."  *Id.* at 14–15.  Then, the Arbitrator found that the March 2021 shipment which MSV

---

[9] In their Proposed Findings of Fact and Conclusions of Law, Defendants cited to New York federal and state caselaw on veil-piercing and corporate separateness, and argued, in part:  "MSV's Statement of Claim does not allege a 'veil piercing' claim against Shapiro.  And for good reason.  The contracting party to the SPA was Paz as a separate entity and there was absolutely no expectation or understanding on the part of MSV that Shapiro would have any personal liability for the obligations of Paz under the SPA merely because Shapiro was the sole and controlling member of Paz . . . . Shapiro, in no respect, abused the privilege of doing business in corporate form and there is no basis for disregarding Paz's separate identity."  Doc. 145-26 ¶ 34 (internal citation omitted).

inspected in California "contained non-conforming goods that were properly rejected." *Id.* at 27. The Arbitrator further found that while Plaintiffs' verbal notice in March 2021 that Defendants breached did not comply with the SPA's requirement that any notice of breach be in writing, Plaintiffs nonetheless provided appropriate written notice on May 19, 2021, thereby triggering Defendants' 30-day cure period. *Id.* at 16–18. However, Defendants' June shipment was not tendered within the required 25-mile radius of New York City, and the July shipment was outside the cure period. *Id.* at 16–18. Given "neither shipment 'strictly' adhered to the terms of the SPA," Plaintiffs rightfully rejected both. *Id.* at 27. Therefore, the Arbitrator concluded that PAZ breached the SPA and failed to cure the breach.

- **Shapiro is personally liable for PAZ's breach of the SPA.** The Arbitrator first noted that Plaintiffs timely requested Shapiro be held liable for breach of the SPA, even though they did not bring that claim in their arbitration demand, since they made the request prior to the issuance of the Award and did not submit any evidence after the close of the evidentiary record. *Id.* at 19 n.5.[10] Then, the Arbitrator established that veil-piercing was not required, as New York law permits individual liability for a "corporate officer who participates in the commission of a tort . . . regardless of whether the corporate veil is pierced."[11] *Id.* at 20 (quoting *FLB, LLC v. Cellco Partnership*, 536 F. App'x 132, 133 (2d Cir. 2013) (citation omitted)). Therefore, the Arbitrator noted that because Shapiro was the only individual asserted to have acted on behalf of PAZ, "if Paz Global defrauded Claimants it is beyond cavil that Shapiro is liable for that fraudulent conduct." *Id.* The Arbitrator went on to find that Shapiro personally engaged in fraud warranting personal liability. She analyzed Shapiro's testimony that PAZ was merely a "middleman" between the buyer and "true seller," concluding that "[b]y these statements alone Shapiro has made the case that he defrauded Claimants." *Id.* at 21–22. The Arbitrator found this conclusion was "reinforced by Shapiro's conduct with respect to both the Escrow Agreement and the Guarantee Agreement," given he released Barron's funds to Glover Court, not PAZ, in direct contravention of his explicit obligations under the SPA, escrow, and guarantee agreements. *Id.* at 22. The Arbitrator additionally found that Germain's rebuttal testimony, while not wholly credible, did "corroborate much of the evidence in the instant case." *Id.* at 22–24. The Arbitrator concluded: "In sum, the evidence is overwhelming that Shapiro was personally involved in a fraud in which MSV/Barron were the victims. Contracts are not just pieces of paper. They are legal obligations. Their terms are binding. One party to a contract cannot simply do as he wishes and then disclaim any liability for his

---

[10] The Award does not specify exactly at what point or through what submission Plaintiffs requested that Shapiro to be held liable for breach of the SPA.

[11] Therefore, Defendants' assertion—in their Proposed Findings of Fact and Conclusions of Law—that Plaintiffs did not argue a veil-piercing claim against Shapiro was of no moment.

actions.  Shapiro took the money from Barron; he did not produce the goods in the manner required by the contract, and he did not return Barron's money despite several admissions that he knew he owed the money.  Accordingly, Shapiro is personally liable for the breach of the SPA."  *Id.* at 24–25.

- **Shapiro breached the escrow agreement by fraudulently sending the escrow funds to someone other than PAZ.**  The Arbitrator analyzed the escrow agreement's provisions pertaining to the Escrow Agent, the law firm Shapiro & Associates, and noted the relationship between the firm and Shapiro—its principal owner and signatory to the escrow agreement on its behalf.  *Id.* at 9–10, 25.  The Arbitrator then explained that "Shapiro clearly breached his fiduciary duty as a trustee of [the] escrow account when he sent money to someone other than [PAZ]," given the three agreements required that the funds be released only to the seller, and only in order to procure the PPE specified in the SPA.  *Id.* at 21, 25.  The Arbitrator found Shapiro's own admission that he had "no control over what Glover [Court] did with the $2 million" to be particularly telling in the context of Shapiro's fraudulent "lack of adherence" to the terms of the SPA and escrow agreements.  *Id.* 21–22.

- **Shapiro breached the guarantee agreement because after "the investment did not succeed," he failed to return Barron's $2 million within 30 days.**  Doc. 133-12.  The Arbitrator found that "the investment did not succeed," and thus the guarantee agreement was triggered, based on her earlier analysis of breach of contract elements and her findings of breach of the SPA.  She also evaluated Shapiro's argument that "despite his absolute, irrevocable, and unconditional guaranty," he was protected from liability based on the guarantee agreement's disclaimer that Barron's payment was "an investment, subject to all the generally accepted rules and regulations of investments."  *Id.* at 26.  The Arbitrator reasoned that interpreting that disclaimer as a limitation on liability would render the guarantee meaningless.  *Id.* at 26–27.  She explained:  "Speculative investments are one thing – contractual obligations are another.  There was no speculation here – Respondents signed a contract requiring that [PAZ] supply specified goods under the terms and conditions set forth in the contract.  This never happened.  Because of that, the investment did not succeed.  As Shapiro has not returned the $2 million to Barron within '30 days after it is reasonably concluded that the investment has failed' as required by the Guarantee Agreement, Shapiro has breached the Guarantee Agreement."  *Id.* (internal citation omitted).

On June 4, 2024, MSV and Barron informed the Court of the arbitration award and of their anticipated motion to confirm it.  Doc. 129.  MSV and Barron now move to confirm the Award, and Shapiro and PAZ cross-move to vacate it.  Docs. 132, 144.

II.    **LEGAL STANDARD**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, provides a "streamlined" process for a party seeking "a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Hall St. Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008). District courts "treat a petitioner's application to confirm or vacate an arbitral award as akin to a motion for summary judgment." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 136 (2d Cir. 2011) (internal quotation marks and citation omitted). The award should be confirmed "if a ground for the Arbitrator's decision can be inferred from the facts of the case." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (internal quotation marks and citation omitted). The Second Circuit has recognized that "an extremely deferential standard of review" is appropriate in the context of arbitral awards in order "[t]o encourage and support the use of arbitration by consenting parties." *Porzig v. Dresdner, Kleinwort, Benson, North Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007). "The arbitrator's rationale for an award need not be explained, and . . . [o]nly 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm the award." *D.H. Blair & Co.*, 462 F.3d at 110 (quoting *Landy Michaels Realty Corp. v. Local 32B–32J, Service Employees Int'l Union, AFL-CIO*, 954 F.2d 794, 797 (2d Cir. 1992)). Confirmation of an arbitration award is thus "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected." *Id.* (internal quotation marks and citations omitted). This "severely limited" review promotes the twin goals of arbitration, namely to "settle[] disputes efficiently and avoid[] long and expensive litigation." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997).

Conversely, "[a] party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair & Co.*, 462 F.3d at 110 (citation omitted).  The party moving to vacate an award bears "the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003).  Thus, a party seeking vacatur of an Arbitrator's decision "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).  Under the FAA, a court may vacate an award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  In addition, as "judicial gloss" on these specific grounds for vacatur, the Second Circuit has held that "the court may set aside an arbitration award if it was rendered in manifest disregard of the law." *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 451 (2d Cir. 2011) (internal quotation marks and citation omitted).

## III.   DISCUSSION

Plaintiffs seek confirmation of the arbitration award and argue that there is no basis for vacating or modifying it.  *See* Docs. 132, 134, 156.  Defendants argue that the motion should be vacated or modified because (i) the Arbitrator exceeded her powers and denied Defendants a fair opportunity to be heard, and (ii) she manifestly disregarded the law.  Docs. 144, 146, 160.

14

### A. The Arbitrator Did Not Exceed Her Powers, and the Proceedings Were Not Fundamentally Unfair

Defendants allege that the Arbitrator went beyond her authority and deprived Shapiro of a fair hearing by holding him liable for breaching the escrow agreement, for fraud, and for PAZ's breach of the SPA.  First, Defendants argue that all claims related to the escrow agreement were required to be adjudicated in New York courts, not arbitrated. Doc. 146 at 6, 15.  Second, they argue Plaintiffs' claims were circumscribed by their demand for arbitration, and thus, given they did not articulate claims against Shapiro for breach of the escrow agreement, fraud, and PAZ's breach of the SPA, those claims were foreclosed.  *Id.* at 4–5, 10–11, 15–18.  Additionally, Defendants claim the Arbitrator improperly failed to consider or apply certain evidence in her analysis.  Doc. 146 at 10–11; Doc. 160 ¶¶ 9, 20–22.  Thus, Defendants claim, "the award was a total 'ambush'" and a fundamental deprivation of due process.  Doc. 160 ¶ 13.

An arbitrator exceeds her powers under Section 10(a)(4) of the FAA by "considering issues beyond those the parties have submitted for her consideration, or . . . reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011).  When a party seeks to vacate an arbitration award by reason of an arbitrator exceeding their power, "the inquiry looks only to whether the arbitrator had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, and does not consider whether the arbitrator decided the issue correctly."  *Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 586 (S.D.N.Y. 2014).  "Only if the arbitrator acts outside the scope of his contractually delegated authority . . . may a court overturn his determination." *Id.*  "An arbitrator cannot be said to have exceeded the scope of his powers unless 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  *L'Objet, LLC v. Samy D. Limited*, No. 11 Civ. 3856

15

(LBS), 2011 WL 4528297, at *2 (S.D.N.Y. Sept. 29, 2011) (quoting *Wall St. Associates, L.P. v. Becker Paribas, Inc.*, 818 F. Supp. 679, 684 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 845 (2d Cir. 1994)).

Courts allow for vacatur under Section 10(a)(3) of the FAA if the arbitrator is guilty of misconduct that amounts to violation of "fundamental fairness." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997). "Arbitral misconduct typically arises where there is proof of either bad faith or gross error on the part of the arbitrator." *In re Cragwood Managers, L.L.C. (Reliance Ins. Co.)*, 132 F. Supp. 2d 285, 287 (S.D.N.Y. 2001) (internal quotations marks and modifications omitted). Arbitrators must "give each of the parties to the dispute an adequate opportunity to present its evidence and argument," but need not follow "all the niceties observed by the federal courts" such as the Federal Rules of Civil Procedure or the Federal Rules of Evidence, nor hear all of the evidence proffered by a party. *Tempo Shain Corp.*, 120 F.3d at 20 (citations omitted); *see also Global Scholarship Alliance v. Wyckoff Heights Med. Ctr.*, No. 09 Civ. 8193 (RMB), 2010 WL 749839, at *2 (S.D.N.Y. Feb. 24, 2010). There is also "no bright line rule requiring arbitrators to conduct oral hearings." *ST Shipping & Transport PTE, Ltd. v. Agathonissos Special Maritime Enterprise*, No. 15 Civ. 4983 (AT), 2016 WL 5475987, at *4 (S.D.N.Y. June 6, 2016). To demonstrate arbitral misconduct, the challenging party must show that his "*right to be heard has been grossly and totally blocked*," *Stifel, Nicolaus & Co. v. Forster*, No. 14 Civ. 6523 (RWS), 2015 WL 509684, at *5 (S.D.N.Y. Feb. 6, 2015) (emphasis added) (internal quotation marks and citation omitted), and that this exclusion of evidence prejudiced him, *Rai v. Barclays Capital Inc.*, 739 F. Supp. 2d 364, 372 (S.D.N.Y. 2010), *aff'd*, 456 F. App'x. 8 (2d Cir. 2011).

The Court finds that the Arbitrator did not exceed her powers, as her adjudication was within the scope of both the arbitration agreement and the parties' submissions. First, the broad arbitration clause did not limit the scope of arbitration, nor did the escrow agreement, by its language, preclude arbitration of its claims.  In any event, and importantly, Defendants are judicially estopped from arguing that the SPA's arbitration provision does not apply to the escrow agreement; Defendants took the exact opposite position in their motion to compel, and the Court adopted that position in granting Defendants' motion.  Docs. 54, 89.[12]  *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011) (judicial estoppel "prevents a party from asserting a 'factual position . . . clearly inconsistent' with a position previously advanced by that party and 'adopted by . . . the court in some manner'" (quoting *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir. 1997))).  Therefore, the Court will not depart from its prior holding that all claims related to the SPA, escrow, and guarantee agreements are within the scope of the SPA's arbitration provision.  Doc. 89.  Second, Defendants do not provide any authority to support the proposition that all claims need to be explicitly identified in a particular written submission to an arbitrator, such as in a demand for arbitration, to be adjudicated therein.[13]  By contrast, Plaintiffs cite two cases showing that courts take a broader approach to determining whether an issue was submitted to arbitration "under circumstances which afforded the parties adequate notice."  *Lawlor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 19 Civ. 4145 (BMC), 2019 WL 6253808, at *2 (E.D.N.Y. Nov. 22, 2019); *see also Sociedad Armadora Aristomenis Panama, S. A. v.*

[12] Defendants argued in their motion to compel arbitration that "the arbitration provision in the SPA is applicable to the escrow agreement and thus the Plaintiff[s] must arbitrate any dispute related to the SPA and the Escrow Agreement."  Doc. 54 at 8.  They additionally argued that the SPA, escrow, and guarantee agreements all comprised one "global" transaction, and the SPA superseded the escrow agreement.  *See* Doc. 89 at 12.

[13] And as Plaintiffs note, Doc. 156 at 5, Defendants attempt to apply Federal Rule of Civil Procedure 15(b)—which governs the amendment of pleadings in a civil trial—to the arbitration.  *See* Doc. 134 at 9.

*Tri-Coast S. S. Co.*, 184 F. Supp. 738 (S.D.N.Y. 1960).  At bar, Plaintiffs make clear that Shapiro's conduct was put at issue in Plaintiffs' amended complaint filed in the instant civil action, in the evidentiary hearing before the Arbitrator, and in the parties' written submissions to the Arbitrator—including the supplemental post-hearing memoranda addressing the Arbitrator's questions.  *See* Doc. 156 at 4.[14]  Therefore, notwithstanding that the claims were not each delineated in Plaintiffs' demand for arbitration, the Court finds that the disputes concerning Shapiro's liability were properly "submitted for her consideration."  *Jock*, 646 F.3d at 122.[15]  The Arbitrator thus acted within her power, based on both the arbitration agreement and the parties' submissions, in finding Shapiro liable.  *See Seed Holdings, Inc.*, 5 F. Supp. 3d at 586.

The Court also finds that the Arbitrator did not render Defendants' right to be heard "grossly and totally blocked."  *Stifel*, 2015 WL 509684, at *5 (internal citation omitted).  The Arbitrator heard testimony by Shapiro and four other individuals, received dozens of exhibits, accepted Shapiro's belated evidentiary submission, and reviewed multiple memoranda by the parties.  Moreover, the Arbitrator gave the parties the choice either to submit written briefs or hold additional oral argument to address her list of questions, which explicitly raised the issue of Shapiro's personal liability for PAZ's breach of contract.  Shapiro chose the former and filed a supplemental post-hearing brief. Doc. 155-2.  Therefore, the Court finds the Arbitrator provided each party with the

---

[14] Additionally, the arbitration clause in this case is broad, covering "all disputes" between the parties.  *Cf. Matter of Arb. Between Melun Industries, Inc. & Strange*, 898 F. Supp. 990, 994 (S.D.N.Y. 1990) (holding the arbitrator exceeded its powers in determining an issue that the party "conceivably may have [had] valid claims" about, since that issue was clearly excluded by the arbitration clause which was "quite narrow" and "d[id] not empower the arbitrator to resolve any and all disputes between the parties").

[15] The Court also defers to the Arbitrator's finding that Plaintiffs timely requested Shapiro be held liable for PAZ's breach of the SPA, since "[a] request made prior to the issuance of an award is timely so long as no new evidence is submitted after the evidentiary record is closed."  Doc. 133-12 at 19 n.5.

"opportunity to present its evidence and argument," *Tempo Shain Corp.*, 120 F.3d at 20 (citation omitted), and the arbitration did not violate fundamental fairness.

As to Defendants' claims that the Arbitrator ignored, misunderstood, or improperly declined to take judicial notice of certain evidence—Doc. 146 at 10–11; Doc. 160 ¶¶ 20–22—the Court declines to conduct such evidentiary review. *Tempo Shain Corp.*, 120 F.3d at 20 ("Courts have interpreted section 10(a)(3) to mean that except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review."); *see also Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 289 (S.D.N.Y. 2007) ("[A]n arbitrator has discretion to admit or reject evidence[.]"). Notwithstanding how pertinent Defendants' evidence might have been, Defendants cannot show prejudice, as they have not made a showing that any excluded evidence was "so dispositive to [their] claims that access to them—as opposed to all the other evidence and testimony before the [Arbitrator]—would have changed the outcome of the proceedings." *Rollins v. Goldman Sachs & Co. LLC*, No. 18 Civ. 7162 (ER), 2022 WL 1124823, at *6 (S.D.N.Y. Apr. 14, 2022).[16]

In sum, the Arbitrator acted within the scope of her authority, and the proceeding was not fundamentally unfair.

## B. The Arbitrator Did Not Manifestly Disregard the Law or the Parties' Agreements

### 1. The Law

In some circumstances, a court may vacate an arbitration award where the Arbitrator has manifestly disregarded the law, although such review is "severely

---

[16] Defendants' reference to *Areca, Inc. v. Oppenheimer & Co.* for the proposition that where "the arbitrator refuses to hear pertinent and material evidence to the prejudice of one of the parties, the arbitration award may be set aside," omits a crucial qualifier. 960 F. Supp. 52, 54 (S.D.N.Y. 1997). *Areca, Inc.* specifies that it is only where an arbitrator engages in misconduct that "amount[s] to a denial of fundamental fairness of the arbitration" that the award may be set aside. *Id.* at 54–55 (citation omitted).

limited." *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998) (citation omitted). "A party seeking vacatur must therefore demonstrate that the Arbitrator knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 217 (2d Cir. 2002); *see also Duferco*, 333 F.3d at 389. "[A]wards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (internal quotation marks and citation omitted). To vacate an arbitration award based on manifest disregard of the law, a party must make a two part showing: (1) "whether the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable," and (2) "whether the arbitrator knew about the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it." *Jock*, 646 F.3d at 121 n.1 (internal quotation marks and citation omitted). Where "the arbitrators do not explain the reason for their decision," it should be upheld if the court "can discern any valid ground for it." *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011).

    Defendants do not make a showing that the Arbitrator manifestly disregarded the law.[17] Defendants first contend that the Arbitrator manifestly disregarded the law on fraud because the facts of the case could not possibly support a finding that Shapiro engaged in fraud, and because no veil-piercing argument was made in holding him liable

---

[17] To the extent Defendants' arguments hinge on what they contend are the Arbitrator's factual mistakes, *see* Doc. 145-37, these arguments fall outside the scope of the Court's judicial review. *See Westerbeke*, 304 F.3d at 214 ("The arbitrator's factual findings and contractual interpretation are not subject to judicial challenge, particularly on our limited review of whether the Arbitrator manifestly disregarded the law.").

20

for PAZ's breach of the SPA.[18]  Doc. 146 at 8, 21.  These contentions are entirely

conclusory.  In evaluating Shapiro's conduct, the Arbitrator carefully considered

Shapiro's obligations under the SPA, escrow, and guarantee agreements, the defenses

Shapiro proffered at the evidentiary hearing, and the testimony provided by rebuttal

witness Germain.  *See* Doc. 133-12 at 20–24.  In her well-reasoned analysis, the

Arbitrator ultimately concluded that "the evidence is overwhelming that Shapiro was

personally involved in a fraud in which MSV/Barron were the victims."  *Id.* at 24.  The

Arbitrator also considered New York law on when the "corporate veil" shields

individuals from liability.  *Id.* at 20–21.[19]  The Arbitrator even elicited argument from the

parties on whether Shapiro could be held personally liable for a breach of contract by

PAZ *regardless of whether Plaintiffs made a "veil-piercing" argument*, by including that

precise question in her April 29, 2024 list of questions that the parties addressed in their

supplemental post-hearing memoranda.  The Arbitrator ultimately *declined* to pierce the

corporate veil in finding Shapiro liable for breach of the SPA, relying instead on Second

Circuit authority providing that veil-piercing is not necessary for holding corporate

officers liable for their own fraudulent conduct.  Thus, Defendants do not meet the

"heavy burden" of "prov[ing] that the arbitrator was fully aware of the existence of a

clearly defined governing legal principle, but refused to apply it."  *Doscher v. Sea Port*

---

[18] Shapiro also argues for the first time in his sur-reply that that the Arbitrator disregarded New York law against fraud claims that are "duplicative" of contract claims.  Doc. 160 ¶ 18–19.  Because this argument was not raised in Defendants' earlier memorandum in support of their motion to vacate the Award, Doc. 146, Plaintiffs did not have an opportunity to respond, and the Court will not consider it.

[19] Defendants briefly argue that, in holding Shapiro personally liable for PAZ's breach of the SPA without piercing the corporate veil, the Arbitrator also manifestly disregarded "the fundamental public policy of the State of New York."  Doc. 146 at 21; *id.* at 7 (citing to *Caremark, LLC v. New York Cancer and Blood Specialists*, 23 Civ. 8508 (NRB), 2024 WL 3413470, at *7 (S.D.N.Y. July 15, 2024)).  The Court finds Defendants fail to meet the standard for the "extremely limited" public policy exception, as they do not establish that the Award "violate[s] some explicit public policy that is well defined and dominant," as "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  *Caremark*, 2024 WL 3413470, at *7 (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42 (1987)).

*Grp. Securities, LLC*, No. 15 Civ. 384 (JMF), 2017 WL 6061653 (S.D.N.Y. Dec. 6, 2017) (citation omitted), *aff'd*, 752 F. App'x 102 (2d Cir. 2019).

Defendants' claim that the Arbitrator manifestly disregarded breach of contract law is likewise unavailing.  To the contrary, the Award explicitly identifies and applies the elements of a breach of contract claim.  Specifically, the Arbitrator found that 45 days constituted a "reasonable time" for performance under the SPA, and that the "investment did not succeed," as contemplated by the guarantee agreement.  These findings were based on a sound evaluation of ample evidence.  Doc. 133-12 at 14–15, 27.  Defendants' contrary argument that the SPA *was* fully performed and the guarantee agreement was never triggered by an investment failure—and thus neither contract was breached—are plainly insufficient to clear the "high hurdle" for vacatur based on a manifest disregard of the law or the terms of the parties' agreements.  *Stolt-Nielson*, 559 U.S. at 671; *see also Eaton Partners, LLC v. Azimuth Cap. Mgmt. IV, Ltd.*, No. 18 Civ. 11112 (ER), 2019 WL 5294934, at *5 (S.D.N.Y. Oct. 18, 2019), *aff'd*, 844 F. App'x 441 (2d Cir. 2021).

Defendants argue, in the alternative, that the Arbitrator manifestly disregarded Plaintiffs' duty to mitigate damages from any breach of contract, because MSV clearly abdicated that duty by rejecting the seven shipments of gloves offered in June and July.  Doc. 146 at 13.  But the Arbitrator did analyze whether MSV properly rejected the gloves it was offered, finding that "[t]he March shipment contained non-conforming goods that were properly rejected" and Plaintiffs "were not required to accept the June or July shipments (even if conforming), because neither shipment 'strictly' adhered to the terms of the SPA[.]"  Doc. 133-12 at 27.  Therefore, Defendants' argument does not pass muster.[20]

---

[20] The Court does not make a determination as to whether a duty to mitigate applied as Defendants' claim, as in any event, the Court "can discern a[] valid ground" for the Arbitrator's finding that MSV and Barron appropriately rejected the goods.  *STMicroelectronics*, 648 F.3d at 78.

2. *The Parties' Agreements*

A court may also vacate an arbitration award where the arbitrator has manifestly disregarded terms of the parties' agreements. *Schwartz*, 665 F.3d at 451–52. "It is only when an arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Stolt-Nielson*, 559 U.S. at 671 (quoting *Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 (2001)). An arbitrator's interpretation of the contract terms cannot be overruled, even if the court disagrees with it, if the arbitrator provided a "barely colorable justification" for her interpretation. *Schwartz*, 665 F.3d at 452 (quoting *Westerbeke*, 304 F.3d at 222).

Defendants argue that the Arbitrator ignored various agreement terms that limited or foreclosed Defendants' liability: force majeure clauses, the SPA's notice of breach provision, and the escrow agreement's limitations on the Escrow Agent's obligations and liability. Doc. 146 at 8, 12–13, 14–15, 18–21. This argument is unavailing, as the Arbitrator meaningfully engaged with the relevant contract provisions and carefully considered their applicability. In discussing the force majeure clauses, the Arbitrator analyzed the timing and surrounding circumstances of both the pandemic and the alleged shipping problems from China, ultimately finding that these events did not explain the delivery delays relevant to the contract breaches. Doc. 133-12 at 15. The Arbitrator also thoroughly analyzed the SPA's notice provision, in fact rejecting Plaintiffs' arguments as to whether their March 2021 oral communication regarding breach met the SPA's formal notice requirements; nonetheless, the Arbitrator concluded that Plaintiffs eventually provided the required written notice in May 2021. *Id.* at 15–16. As to the escrow agreement's limitations on liability, the Arbitrator considered the relevant provisions, and after careful consideration of Shapiro's role as trustee of the escrow account, she

23

concluded that his misconduct warranted personal liability. *Id.* at 10, 20, 25. Therefore, the Arbitrator did not disregard contractual terms such that the Award "contradicts an express and unambiguous term of the contract or . . . the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke*, 304 F.3d at 222.

In sum, Defendants have not shown that the Arbitrator manifestly disregarded the applicable law or the parties' agreements.

## IV.    CONCLUSION

For the reasons set forth above, MSV and Barron's motion to confirm the arbitration award is GRANTED, and Shapiro and PAZ's cross-motion to vacate the award is DENIED. The Clerk of Court is respectfully directed to lift the stay, terminate the motions, Docs. 132 and 144, and to close the case.

It is SO ORDERED.

Dated:    December 2, 2024
          New York, New York

_____
                    EDGARDO RAMOS, U.S.D.J.

24